William B. WEINBERGER, Plaintiff
Below, Appellant,

v.

UOP, INC., et al., Defendants
Below, Appellees.

Supreme Court of Delaware.

Submitted: July 16, 1982.

Decided: Feb. 1, 1983.

William Prickett (argued), John H. Small, and George H. Seitz, III, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant UOP, Inc.

Robert K. Payson and Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, and Alan N. Halkett (argued) of Latham & Watkins, Los Angeles, Cal., for defendant The Signal Companies, Inc.

Before HERRMANN, C.J., McNEILLY, QUILLEN, HORSEY and MOORE, JJ., constituting the Court en Banc.

MOORE, Justice:

This post-trial appeal was reheard en banc from a decision of the Court of Chan-

cery.[1] It was brought by the class action plaintiff below, a former shareholder of UOP, Inc., who challenged the elimination of UOP's minority shareholders by a cash-out merger between UOP and its majority owner, The Signal Companies, Inc.[2] Originally, the defendants in this action were Signal, UOP, certain officers and directors of those companies, and UOP's investment banker, Lehman Brothers Kuhn Loeb, Inc.[3] The present Chancellor held that the terms of the merger were fair to the plaintiff and the other minority shareholders of UOP. Accordingly, he entered judgment in favor of the defendants.

Numerous points were raised by the parties, but we address only the following questions presented by the trial court's opinion:

1) The plaintiff's duty to plead sufficient facts demonstrating the unfairness of the challenged merger;

2) The burden of proof upon the parties where the merger has been approved by the purportedly informed vote of a majority of the minority shareholders;

3) The fairness of the merger in terms of adequacy of the defendants' disclosures to the minority shareholders;

4) The fairness of the merger in terms of adequacy of the price paid for the minority shares and the remedy appropriate to that issue; and

5) The continued force and effect of *Singer v. Magnavox Co.,* Del.Supr., 380 A.2d 969, 980 (1977), and its progeny.

■ In ruling for the defendants, the Chancellor re-stated his earlier conclusion that the plaintiff in a suit challenging a cash-out merger must allege specific acts of fraud, misrepresentation, or other items of misconduct to demonstrate the unfairness of the merger terms to the minority.[4] We approve this rule and affirm it.

■ The Chancellor also held that even though the ultimate burden of proof is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair, it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation. We agree with that principle. However, where corporate action has been approved by an informed vote of a majority of the minority shareholders, we conclude that the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority. *See, e.g., Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 224 (1979). But in all this, the burden clearly remains on those relying on the vote to show that they completely disclosed all material facts relevant to the transaction.

■ Here, the record does not support a conclusion that the minority stockholder vote was an informed one. Material information, necessary to acquaint those shareholders with the bargaining positions of Signal and UOP, was withheld under circumstances amounting to a breach of fiduciary duty. We therefore conclude that this merger does not meet the test of fairness, at least as we address that concept, and no burden thus shifted to the plaintiff by reason of the minority shareholder vote. Accordingly, we reverse and remand for further proceedings consistent herewith.

■ In considering the nature of the remedy available under our law to minority shareholders in a cash-out merger, we believe that it is, and hereafter should be, an appraisal under 8 *Del.C.* § 262 as hereinafter construed. We therefore overrule *Lynch v. Vickers Energy Corp.,* Del.Supr.,

---

1. Accordingly, this Court's February 9, 1982 opinion is withdrawn.

2. For the opinion of the trial court see *Weinberger v. UOP, Inc.,* Del.Ch., 426 A.2d 1333 (1981).

3. Shortly before the last oral argument, the plaintiff dismissed Lehman Brothers from the

action. Thus, we do not deal with the issues raised by the plaintiff's claims against this defendant.

4. In a pre-trial ruling the Chancellor ordered the complaint dismissed for failure to state a cause of action. *See Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d 1262 (1979).

429 A.2d 497 (1981) (*Lynch II*) to the extent that it purports to limit a stockholder's monetary relief to a specific damage formula. *See Lynch II*, 429 A.2d at 507–08 (McNeilly & Quillen, JJ., dissenting). But to give full effect to section 262 within the framework of the General Corporation Law we adopt a more liberal, less rigid and stylized, approach to the valuation process than has heretofore been permitted by our courts. While the present state of these proceedings does not admit the plaintiff to the appraisal remedy per se, the practical effect of the remedy we do grant him will be co-extensive with the liberalized valuation and appraisal methods we herein approve for cases coming after this decision.

Our treatment of these matters has necessarily led us to a reconsideration of the business purpose rule announced in the trilogy of *Singer v. Magnavox Co., supra; Tanzer v. International General Industries, Inc.*, Del.Supr., 379 A.2d 1121 (1977); and *Roland International Corp. v. Najjar*, Del.Supr., 407 A.2d 1032 (1979). For the reasons hereafter set forth we consider that the business purpose requirement of these cases is no longer the law of Delaware.

## I.

The facts found by the trial court, pertinent to the issues before us, are supported by the record, and we draw from them as set out in the Chancellor's opinion.[5]

Signal is a diversified, technically based company operating through various subsidiaries. Its stock is publicly traded on the New York, Philadelphia and Pacific Stock Exchanges. UOP, formerly known as Universal Oil Products Company, was a diversified industrial company engaged in various lines of business, including petroleum and petro-chemical services and related products, construction, fabricated metal products, transportation equipment products, chemicals and plastics, and other products and services including land development, lumber products and waste disposal. Its stock was publicly held and listed on the New York Stock Exchange.

In 1974 Signal sold one of its wholly-owned subsidiaries for $420,000,000 in cash. *See Gimbel v. Signal Companies, Inc.*, Del. Ch., 316 A.2d 599, *aff'd*, Del.Supr., 316 A.2d 619 (1974). While looking to invest this cash surplus, Signal became interested in UOP as a possible acquisition. Friendly negotiations ensued, and Signal proposed to acquire a controlling interest in UOP at a price of $19 per share. UOP's representatives sought $25 per share. In the arm's length bargaining that followed, an understanding was reached whereby Signal agreed to purchase from UOP 1,500,000 shares of UOP's authorized but unissued stock at $21 per share.

This purchase was contingent upon Signal making a successful cash tender offer for 4,300,000 publicly held shares of UOP, also at a price of $21 per share. This combined method of acquisition permitted Signal to acquire 5,800,000 shares of stock, representing 50.5% of UOP's outstanding shares. The UOP board of directors advised the company's shareholders that it had no objection to Signal's tender offer at that price. Immediately before the announcement of the tender offer, UOP's common stock had been trading on the New York Stock Exchange at a fraction under $14 per share.

The negotiations between Signal and UOP occurred during April 1975, and the resulting tender offer was greatly oversubscribed. However, Signal limited its total purchase of the tendered shares so that, when coupled with the stock bought from UOP, it had achieved its goal of becoming a 50.5% shareholder of UOP.

Although UOP's board consisted of thirteen directors, Signal nominated and elected only six. Of these, five were either directors or employees of Signal. The sixth, a partner in the banking firm of Lazard Freres & Co., had been one of Signal's representatives in the negotiations and bargaining with UOP concerning the tender offer and purchase price of the UOP shares.

**5.** *Weinberger v. UOP, Inc.*, Del.Ch., 426 A.2d 1333, 1335–40 (1981).

However, the president and chief executive officer of UOP retired during 1975, and Signal caused him to be replaced by James V. Crawford, a long-time employee and senior executive vice president of one of Signal's wholly-owned subsidiaries. Crawford succeeded his predecessor on UOP's board of directors and also was made a director of Signal.

By the end of 1977 Signal basically was unsuccessful in finding other suitable investment candidates for its excess cash, and by February 1978 considered that it had no other realistic acquisitions available to it on a friendly basis. Once again its attention turned to UOP.

The trial court found that at the instigation of certain Signal management personnel, including William W. Walkup, its board chairman, and Forrest N. Shumway, its president, a feasibility study was made concerning the possible acquisition of the balance of UOP's outstanding shares. This study was performed by two Signal officers, Charles S. Arledge, vice president (director of planning), and Andrew J. Chitiea, senior vice president (chief financial officer). Messrs. Walkup, Shumway, Arledge and Chitiea were all directors of UOP in addition to their membership on the Signal board.

Arledge and Chitiea concluded that it would be a good investment for Signal to acquire the remaining 49.5% of UOP shares at any price up to $24 each. Their report was discussed between Walkup and Shumway who, along with Arledge, Chitiea and Brewster L. Arms, internal counsel for Signal, constituted Signal's senior management. In particular, they talked about the proper price to be paid if the acquisition was pursued, purportedly keeping in mind that as UOP's majority shareholder, Signal owed a fiduciary responsibility to both its own stockholders as well as to UOP's minority. It was ultimately agreed that a meeting of Signal's executive committee would be called to propose that Signal acquire the remaining outstanding stock of UOP through a cash-out merger in the range of $20 to $21 per share.

The executive committee meeting was set for February 28, 1978. As a courtesy, UOP's president, Crawford, was invited to attend, although he was not a member of Signal's executive committee. On his arrival, and prior to the meeting, Crawford was asked to meet privately with Walkup and Shumway. He was then told of Signal's plan to acquire full ownership of UOP and was asked for his reaction to the proposed price range of $20 to $21 per share. Crawford said he thought such a price would be "generous", and that it was certainly one which should be submitted to UOP's minority shareholders for their ultimate consideration. He stated, however, that Signal's 100% ownership could cause internal problems at UOP. He believed that employees would have to be given some assurance of their future place in a fully-owned Signal subsidiary. Otherwise, he feared the departure of essential personnel. Also, many of UOP's key employees had stock option incentive programs which would be wiped out by a merger. Crawford therefore urged that some adjustment would have to be made, such as providing a comparable incentive in Signal's shares, if after the merger he was to maintain his quality of personnel and efficiency at UOP.

Thus, Crawford voiced no objection to the $20 to $21 price range, nor did he suggest that Signal should consider paying more than $21 per share for the minority interests. Later, at the executive committee meeting the same factors were discussed, with Crawford repeating the position he earlier took with Walkup and Shumway. Also considered was the 1975 tender offer and the fact that it had been greatly oversubscribed at $21 per share. For many reasons, Signal's management concluded that the acquisition of UOP's minority shares provided the solution to a number of its business problems.

Thus, it was the consensus that a price of $20 to $21 per share would be fair to both Signal and the minority shareholders of UOP. Signal's executive committee autho-

rized its management "to negotiate" with UOP "for a cash acquisition of the minority ownership in UOP, Inc., with the intention of presenting a proposal to [Signal's] board of directors . . . on March 6, 1978". Immediately after this February 28, 1978 meeting, Signal issued a press release stating:

> The Signal Companies, Inc. and UOP, Inc. are conducting negotiations for the acquisition for cash by Signal of the 49.5 per cent of UOP which it does not presently own, announced Forrest N. Shumway, president and chief executive officer of Signal, and James V. Crawford, UOP president.

> Price and other terms of the proposed transaction have not yet been finalized and would be subject to approval of the boards of directors of Signal and UOP, scheduled to meet early next week, the stockholders of UOP and certain federal agencies.

The announcement also referred to the fact that the closing price of UOP's common stock on that day was $14.50 per share.

Two days later, on March 2, 1978, Signal issued a second press release stating that its management would recommend a price in the range of $20 to $21 per share for UOP's 49.5% minority interest. This announcement referred to Signal's earlier statement that "negotiations" were being conducted for the acquisition of the minority shares.

Between Tuesday, February 28, 1978 and Monday, March 6, 1978, a total of four business days, Crawford spoke by telephone with all of UOP's non-Signal, i.e., outside, directors. Also during that period, Crawford retained Lehman Brothers to render a fairness opinion as to the price offered the minority for its stock. He gave two reasons for this choice. First, the time schedule between the announcement and the board meetings was short (by then only three business days) and since Lehman Brothers had been acting as UOP's investment banker for many years, Crawford felt that it would be in the best position to respond on such brief notice. Second, James W. Glanville, a long-time director of UOP and a

partner in Lehman Brothers, had acted as a financial advisor to UOP for many years. Crawford believed that Glanville's familiarity with UOP, as a member of its board, would also be of assistance in enabling Lehman Brothers to render a fairness opinion within the existing time constraints.

Crawford telephoned Glanville, who gave his assurance that Lehman Brothers had no conflicts that would prevent it from accepting the task. Glanville's immediate personal reaction was that a price of $20 to $21 would certainly be fair, since it represented almost a 50% premium over UOP's market price. Glanville sought a $250,000 fee for Lehman Brothers' services, but Crawford thought this too much. After further discussions Glanville finally agreed that Lehman Brothers would render its fairness opinion for $150,000.

During this period Crawford also had several telephone contacts with Signal officials. In only one of them, however, was the price of the shares discussed. In a conversation with Walkup, Crawford advised that as a result of his communications with UOP's non-Signal directors, it was his feeling that the price would have to be the top of the proposed range, or $21 per share, if the approval of UOP's outside directors was to be obtained. But again, he did not seek any price higher than $21.

Glanville assembled a three-man Lehman Brothers team to do the work on the fairness opinion. These persons examined relevant documents and information concerning UOP, including its annual reports and its Securities and Exchange Commission filings from 1973 through 1976, as well as its audited financial statements for 1977, its interim reports to shareholders, and its recent and historical market prices and trading volumes. In addition, on Friday, March 3, 1978, two members of the Lehman Brothers team flew to UOP's headquarters in Des Plaines, Illinois, to perform a "due diligence" visit, during the course of which they interviewed Crawford as well as UOP's general counsel, its chief financial officer, and other key executives and personnel.

As a result, the Lehman Brothers team concluded that "the price of either $20 or $21 would be a fair price for the remaining shares of UOP". They telephoned this impression to Glanville, who was spending the weekend in Vermont.

On Monday morning, March 6, 1978, Glanville and the senior member of the Lehman Brothers team flew to Des Plaines to attend the scheduled UOP directors meeting. Glanville looked over the assembled information during the flight. The two had with them the draft of a "fairness opinion letter" in which the price had been left blank. Either during or immediately prior to the directors' meeting, the two-page "fairness opinion letter" was typed in final form and the price of $21 per share was inserted.

On March 6, 1978, both the Signal and UOP boards were convened to consider the proposed merger. Telephone communications were maintained between the two meetings. Walkup, Signal's board chairman, and also a UOP director, attended UOP's meeting with Crawford in order to present Signal's position and answer any questions that UOP's non-Signal directors might have. Arledge and Chitiea, along with Signal's other designees on UOP's board, participated by conference telephone. All of UOP's outside directors attended the meeting either in person or by conference telephone.

First, Signal's board unanimously adopted a resolution authorizing Signal to propose to UOP a cash merger of $21 per share as outlined in a certain merger agreement and other supporting documents. This proposal required that the merger be approved by a majority of UOP's outstanding minority shares voting at the stockholders meeting at which the merger would be considered, and that the minority shares voting in favor of the merger, when coupled with Signal's 50.5% interest would have to comprise at least two-thirds of all UOP shares. Otherwise the proposed merger would be deemed disapproved.

UOP's board then considered the proposal. Copies of the agreement were delivered to the directors in attendance, and other copies had been forwarded earlier to the directors participating by telephone. They also had before them UOP financial data for 1974–1977, UOP's most recent financial statements, market price information, and budget projections for 1978. In addition they had Lehman Brothers' hurriedly prepared fairness opinion letter finding the price of $21 to be fair. Glanville, the Lehman Brothers partner, and UOP director, commented on the information that had gone into preparation of the letter.

Signal also suggests that the Arledge-Chitiea feasibility study, indicating that a price of up to $24 per share would be a "good investment" for Signal, was discussed at the UOP directors' meeting. The Chancellor made no such finding, and our independent review of the record, detailed *infra,* satisfies us by a preponderance of the evidence that there was no discussion of this document at UOP's board meeting. Furthermore, it is clear beyond peradventure that nothing in that report was ever disclosed to UOP's minority shareholders prior to their approval of the merger.

After consideration of Signal's proposal, Walkup and Crawford left the meeting to permit a free and uninhibited exchange between UOP's non-Signal directors. Upon their return a resolution to accept Signal's offer was then proposed and adopted. While Signal's men on UOP's board participated in various aspects of the meeting, they abstained from voting. However, the minutes show that each of them "if voting would have voted yes".

On March 7, 1978, UOP sent a letter to its shareholders advising them of the action taken by UOP's board with respect to Signal's offer. This document pointed out, among other things, that on February 28, 1978 "both companies had announced negotiations were being conducted".

Despite the swift board action of the two companies, the merger was not submitted to UOP's shareholders until their annual

meeting on May 26, 1978. In the notice of that meeting and proxy statement sent to shareholders in May, UOP's management and board urged that the merger be approved. The proxy statement also advised:

> The price was determined after *discussions* between James V. Crawford, a director of Signal and Chief Executive Officer of UOP, and officers of Signal which took place during meetings on February 28, 1978, and in the course of several subsequent telephone conversations. (Emphasis added.)

In the original draft of the proxy statement the word "negotiations" had been used rather than "discussions". However, when the Securities and Exchange Commission sought details of the "negotiations" as part of its review of these materials, the term was deleted and the word "discussions" was substituted. The proxy statement indicated that the vote of UOP's board in approving the merger had been unanimous. It also advised the shareholders that Lehman Brothers had given its opinion that the merger price of $21 per share was fair to UOP's minority. However, it did not disclose the hurried method by which this conclusion was reached.

As of the record date of UOP's annual meeting, there were 11,488,302 shares of UOP common stock outstanding, 5,688,302 of which were owned by the minority. At the meeting only 56%, or 3,208,652, of the minority shares were voted. Of these, 2,953,812, or 51.9% of the total minority, voted for the merger, and 254,840 voted against it. When Signal's stock was added to the minority shares voting in favor, a total of 76.2% of UOP's outstanding shares approved the merger while only 2.2% opposed it.

By its terms the merger became effective on May 26, 1978, and each share of UOP's stock held by the minority was automatically converted into a right to receive $21 cash.

## II.

### A.

A primary issue mandating reversal is the preparation by two UOP directors, Arledge and Chitiea, of their feasibility study for the exclusive use and benefit of Signal. This document was of obvious significance to both Signal and UOP. Using UOP data, it described the advantages to Signal of ousting the minority at a price range of $21–$24 per share. Mr. Arledge, one of the authors, outlined the benefits to Signal: [6]

*Purpose Of The Merger*

1) Provides an outstanding investment opportunity for Signal—(Better than any recent acquisition we have seen.)

2) Increases Signal's earnings.

3) Facilitates the flow of resources between Signal and its subsidiaries—(Big factor—works both ways.)

4) Provides cost savings potential for Signal and UOP.

5) Improves the percentage of Signal's 'operating earnings' as opposed to 'holding company earnings'.

6) Simplifies the understanding of Signal.

7) Facilitates technological exchange among Signal's subsidiaries.

8) Eliminates potential conflicts of interest.

Having written those words, solely for the use of Signal, it is clear from the record that neither Arledge nor Chitiea shared this report with their fellow directors of UOP. We are satisfied that no one else did either. This conduct hardly meets the fiduciary standards applicable to such a transaction. While Mr. Walkup, Signal's chairman of the board and a UOP director, attended the March 6, 1978 UOP board meeting and testified at trial that he had discussed the Arledge-Chitiea report with the UOP directors at this meeting, the record does not support this assertion. Perhaps it is the result of some confusion on Mr. Walkup's

**6.** The parentheses indicate certain handwritten comments of Mr. Arledge.

part. In any event Mr. Shumway, Signal's president, testified that he made sure the Signal outside directors had this report prior to the March 6, 1978 Signal board meeting, but he did not testify that the Arledge-Chitiea report was also sent to UOP's outside directors.

Mr. Crawford, UOP's president, could not recall that any documents, other than a draft of the merger agreement, were sent to UOP's directors before the March 6, 1978 UOP meeting. Mr. Chitiea, an author of the report, testified that it was made available to Signal's directors, but to his knowledge it was not circulated to the outside directors of UOP. He specifically testified that he "didn't share" that information with the outside directors of UOP with whom he served.

None of UOP's outside directors who testified stated that they had seen this document. The minutes of the UOP board meeting do not identify the Arledge-Chitiea report as having been delivered to UOP's outside directors. This is particularly significant since the minutes describe in considerable detail the materials that actually were distributed. While these minutes recite Mr. Walkup's presentation of the Signal offer, they do not mention the Arledge-Chitiea report or any disclosure that Signal considered a price of up to $24 to be a good investment. If Mr. Walkup had in fact provided such important information to UOP's outside directors, it is logical to assume that these carefully drafted minutes would disclose it. The post-trial briefs of Signal and UOP contain a thorough description of the documents purportedly available to their boards at the March 6, 1978, meetings. Although the Arledge-Chitiea report is specifically identified as being available to the Signal directors, there is no mention of it being among the documents submitted to the UOP board. Even when queried at a prior oral argument before this Court, counsel for Signal did not claim that the Ar-

ledge-Chitiea report had been disclosed to UOP's outside directors. Instead, he chose to belittle its contents. This was the same approach taken before us at the last oral argument.

Actually, it appears that a three-page summary of figures was given to all UOP directors. Its first page is identical to one page of the Arledge-Chitiea report, but this dealt with nothing more than a justification of the $21 price. Significantly, the contents of this three-page summary are what the minutes reflect Mr. Walkup told the UOP board. However, nothing contained in either the minutes or this three-page summary reflects Signal's study regarding the $24 price.

The Arledge-Chitiea report speaks for itself in supporting the Chancellor's finding that a price of up to $24 was a "good investment" for Signal. It shows that a return on the investment at $21 would be 15.7% versus 15.5% at $24 per share. This was a difference of only two-tenths of one percent, while it meant over $17,000,000 to the minority. Under such circumstances, paying UOP's minority shareholders $24 would have had relatively little long-term effect on Signal, and the Chancellor's findings concerning the benefit to Signal, even at a price of $24, were obviously correct. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

■ Certainly, this was a matter of material significance to UOP and its shareholders. Since the study was prepared by two UOP directors, using UOP information for the exclusive benefit of Signal, and nothing whatever was done to disclose it to the outside UOP directors or the minority shareholders, a question of breach of fiduciary duty arises. This problem occurs because there were common Signal-UOP directors participating, at least to some extent, in the UOP board's decision-making processes without full disclosure of the conflicts they faced.[7]

7. Although perfection is not possible, or expected, the result here could have been entirely different if UOP had appointed an independent

negotiating committee of its outside directors to deal with *Signal* at arm's length. *See, e.g., Harriman v. E.I. duPont de Nemours & Co.,* 411

### B.

In assessing this situation, the Court of Chancery was required to:

examine what information defendants had and to measure it against what they gave to the minority stockholders, in a context in which 'complete candor' is required. In other words, the limited function of the Court was to determine whether defendants had disclosed all information in their possession germane to the transaction in issue. And by 'germane' we mean, for present purposes, information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock.

    *     *     *     *     *     *

. . . Completeness, not adequacy, is both the norm and the mandate under present circumstances.

*Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 281 (1977) (*Lynch I*). This is merely stating in another way the long-existing principle of Delaware law that these Signal designated directors on UOP's board still owed UOP and its shareholders an uncompromising duty of loyalty. The classic language of *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939), requires no embellishment:

A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability

might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

Given the absence of any attempt to structure this transaction on an arm's length basis, Signal cannot escape the effects of the conflicts it faced, particularly when its designees on UOP's board did not totally abstain from participation in the matter. There is no "safe harbor" for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain. *Gottlieb v. Heyden Chemical Corp.*, Del.Supr., 91 A.2d 57, 57–58 (1952). The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts. *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952); *Bastian v. Bourns, Inc.*, Del.Ch., 256 A.2d 680, 681 (1969), *aff'd*, Del.Supr., 278 A.2d 467 (1970); *David J. Greene & Co. v. Dunhill International Inc.*, Del.Ch., 249 A.2d 427, 431 (1968).

There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. *Levien v. Sinclair Oil Corp.*, Del.Ch., 261 A.2d 911, 915 (1969). Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and in the absence of an independent nego-

F.Supp. 133 (D.Del.1975). Since fairness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them, it is unfortunate that this course apparently was neither considered nor pursued. *Johnston v. Greene*, Del.Supr., 121 A.2d 919, 925 (1956). Particularly in a parent-subsidiary context, a

showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness. *Getty Oil Co. v. Skelly Oil Co.*, Del.Supr., 267 A.2d 883, 886 (1970); *Puma v. Marriott*, Del.Ch., 283 A.2d 693, 696 (1971).

tiating structure (see note 7, *supra* ), or the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies. *Warshaw v. Calhoun,* Del. Supr., 221 A.2d 487, 492 (1966). The record demonstrates that Signal has not met this obligation.

### C.

The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. Moore, *The "Interested" Director or Officer Transaction,* 4 Del.J. Corp.L. 674, 676 (1979); Nathan & Shapiro, *Legal Standard of Fairness of Merger Terms Under Delaware Law,* 2 Del.J. Corp.L. 44, 46–47 (1977). *See Tri-Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 72 (1950); 8 *Del.C.* § 262(h). However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness. However, in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger. Here, we address the two basic aspects of fairness separately because we find reversible error as to both.

### D.

▆ Part of fair dealing is the obvious duty of candor required by *Lynch I, supra.* Moreover, one possessing superior knowledge may not mislead any stockholder by use of corporate information to which the latter is not privy. *Lank v. Steiner,* Del. Supr., 224 A.2d 242, 244 (1966). Delaware

has long imposed this duty even upon persons who are not corporate officers or directors, but who nonetheless are privy to matters of interest or significance to their company. *Brophy v. Cities Service Co.,* Del. Ch., 70 A.2d 5, 7 (1949). With the well-established Delaware law on the subject, and the Court of Chancery's findings of fact here, it is inevitable that the obvious conflicts posed by Arledge and Chitiea's preparation of their "feasibility study", derived from UOP information, for the sole use and benefit of Signal, cannot pass muster.

The Arledge-Chitiea report is but one aspect of the element of fair dealing. How did this merger evolve? It is clear that it was entirely initiated by Signal. The serious time constraints under which the principals acted were all set by Signal. It had not found a suitable outlet for its excess cash and considered UOP a desirable investment, particularly since it was now in a position to acquire the whole company for itself. For whatever reasons, and they were only Signal's, the entire transaction was presented to and approved by UOP's board within four business days. Standing alone, this is not necessarily indicative of any lack of fairness by a majority shareholder. It was what occurred, or more properly, what did not occur, during this brief period that makes the time constraints imposed by Signal relevant to the issue of fairness.

The structure of the transaction, again, was Signal's doing. So far as negotiations were concerned, it is clear that they were modest at best. Crawford, Signal's man at UOP, never really talked price with Signal, except to accede to its management's statements on the subject, and to convey to Signal the UOP outside directors' view that as between the $20–$21 range under consideration, it would have to be $21. The latter is not a surprising outcome, but hardly arm's length negotiations. Only the protection of benefits for UOP's key employees and the issue of Lehman Brothers' fee approached any concept of bargaining.

As we have noted, the matter of disclosure to the UOP directors was wholly flawed by the conflicts of interest raised by the Arledge-Chitiea report. All of those conflicts were resolved by Signal in its own favor without divulging any aspect of them to UOP.

This cannot but undermine a conclusion that this merger meets any reasonable test of fairness. The outside UOP directors lacked one material piece of information generated by two of their colleagues, but shared only with Signal. True, the UOP board had the Lehman Brothers' fairness opinion, but that firm has been blamed by the plaintiff for the hurried task it performed, when more properly the responsibility for this lies with Signal. There was no disclosure of the circumstances surrounding the rather cursory preparation of the Lehman Brothers' fairness opinion. Instead, the impression was given UOP's minority that a careful study had been made, when in fact speed was the hallmark, and Mr. Glanville, Lehman's partner in charge of the matter, and also a UOP director, having spent the weekend in Vermont, brought a draft of the "fairness opinion letter" to the UOP directors' meeting on March 6, 1978 with the price left blank. We can only conclude from the record that the rush imposed on Lehman Brothers by Signal's timetable contributed to the difficulties under which this investment banking firm attempted to perform its responsibilities. Yet, none of this was disclosed to UOP's minority.

Finally, the minority stockholders were denied the critical information that Signal considered a price of $24 to be a good investment. Since this would have meant over $17,000,000 more to the minority, we cannot conclude that the shareholder vote was an informed one. Under the circumstances, an approval by a majority of the minority was meaningless. *Lynch I,* 383 A.2d at 279, 281; *Cahall v. Lofland,* Del.Ch., 114 A. 224 (1921).

Given these particulars and the Delaware law on the subject, the record does not establish that this transaction satisfies any reasonable concept of fair dealing, and the Chancellor's findings in that regard must be reversed.

### E.

Turning to the matter of price, plaintiff also challenges its fairness. His evidence was that on the date the merger was approved the stock was worth at least $26 per share. In support, he offered the testimony of a chartered investment analyst who used two basic approaches to valuation: a comparative analysis of the premium paid over market in ten other tender offer-merger combinations, and a discounted cash flow analysis.

In this breach of fiduciary duty case, the Chancellor perceived that the approach to valuation was the same as that in an appraisal proceeding. Consistent with precedent, he rejected plaintiff's method of proof and accepted defendants' evidence of value as being in accord with practice under prior case law. This means that the so-called "Delaware block" or weighted average method was employed wherein the elements of value, i.e., assets, market price, earnings, etc., were assigned a particular weight and the resulting amounts added to determine the value per share. This procedure has been in use for decades. *See In re General Realty & Utilities Corp.,* Del.Ch., 52 A.2d 6, 14–15 (1947). However, to the extent it excludes other generally accepted techniques used in the financial community and the courts, it is now clearly outmoded. It is time we recognize this in appraisal and other stock valuation proceedings and bring our law current on the subject.

While the Chancellor rejected plaintiff's discounted cash flow method of valuing UOP's stock, as not corresponding with "either logic or the existing law" (426 A.2d at 1360), it is significant that this was essentially the focus, i.e., earnings potential of UOP, of Messrs. Arledge and Chitiea in their evaluation of the merger. Accordingly, the standard "Delaware block" or weighted average method of valuation, for-

merly employed in appraisal and other stock valuation cases, shall no longer exclusively control such proceedings. We believe that a more liberal approach must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court, subject only to our interpretation of 8 *Del.C.* § 262(h), *infra.* *See also* D.R.E. 702–05. This will obviate the very structured and mechanistic procedure that has heretofore governed such matters. *See Jacques Coe & Co. v. Minneapolis-Moline Co.,* Del.Ch., 75 A.2d 244, 247 (1950); *Tri-Continental Corp. v. Battye,* Del.Ch., 66 A.2d 910, 917–18 (1949); *In re General Realty and Utilities Corp., supra.*

Fair price obviously requires consideration of all relevant factors involving the value of a company. This has long been the law of Delaware as stated in *Tri-Continental Corp.,* 74 A.2d at 72:

The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on *future prospects* of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but *must be considered* by the agency fixing the value. (Emphasis added.)

This is not only in accord with the realities of present day affairs, but it is thoroughly consonant with the purpose and intent of our statutory law. Under 8 *Del.C.* § 262(h), the Court of Chancery:

shall appraise the shares, determining their *fair* value exclusive of any element of value arising from the accomplishment or expectation of the merger, together with a fair rate of interest, if any, to be paid upon the amount determined to be the *fair* value. In determining such *fair* value, the Court shall take into account *all relevant factors* . . . (Emphasis added)

*See also Bell v. Kirby Lumber Corp.,* Del. Supr., 413 A.2d 137, 150–51 (1980) (Quillen, J., concurring).

It is significant that section 262 now mandates the determination of "fair" value based upon "all relevant factors". Only the speculative elements of value that may arise from the "accomplishment or expectation" of the merger are excluded. We take this to be a very narrow exception to the appraisal process, designed to eliminate use of *pro forma* data and projections of a speculative variety relating to the completion of a merger. But elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered. When the trial court deems it appropriate, fair value also includes any damages, resulting from the taking, which the stockholders sustain as a class. If that was not the case, then the obligation to consider "all relevant factors" in the valuation process would be eroded. We are supported in this view not only by *Tri-Continental Corp.,* 74 A.2d at 72, but also by the evolutionary amendments to section 262.

Prior to an amendment in 1976, the earlier relevant provision of section 262 stated:

(f) The appraiser shall determine the value of the stock of the stockholders . . . The Court shall by its decree determine the value of the stock of the stockholders entitled to payment therefor . . .

The first references to "fair" value occurred in a 1976 amendment to section 262(f), which provided:

(f) . . . the Court shall appraise the shares, determining their fair value exclusively of any element of value arising from the accomplishment or expectation of the merger. . . .

It was not until the 1981 amendment to section 262 that the reference to "fair value" was repeatedly emphasized and the statutory mandate that the Court "take into account all relevant factors" appeared [section 262(h)]. Clearly, there is a legislative intent to fully compensate shareholders for whatever their loss may be, subject only to the narrow limitation that one can not take speculative effects of the merger into account.

Although the Chancellor received the plaintiff's evidence, his opinion indicates that the use of it was precluded because of past Delaware practice. While we do not suggest a monetary result one way or the other, we do think the plaintiff's evidence should be part of the factual mix and weighed as such. Until the $21 price is measured on remand by the valuation standards mandated by Delaware law, there can be no finding at the present stage of these proceedings that the price is fair. Given the lack of any candid disclosure of the material facts surrounding establishment of the $21 price, the majority of the minority vote, approving the merger, is meaningless.

■ The plaintiff has not sought an appraisal, but rescissory damages of the type contemplated by *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497, 505–06 (1981) (*Lynch II*). In view of the approach to valuation that we announce today, we see no basis in our law for *Lynch II*'s exclusive monetary formula for relief. On remand the plaintiff will be permitted to test the fairness of the $21 price by the standards we herein establish, in conformity with the principle applicable to an appraisal—that fair value be determined by taking "into account all relevant factors" [*see* 8 *Del.C.* § 262(h), *supra*]. In our view this includes

the elements of rescissory damages if the Chancellor considers them susceptible of proof and a remedy appropriate to all the issues of fairness before him. To the extent that *Lynch II,* 429 A.2d at 505–06, purports to limit the Chancellor's discretion to a single remedial formula for monetary damages in a cash-out merger, it is overruled.

While a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association,* Del.Ch., 156 A. 183, 187 (1931). Under such circumstances, the Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages. Since it is apparent that this long completed transaction is too involved to undo, and in view of the Chancellor's discretion, the award, if any, should be in the form of monetary damages based upon entire fairness standards, i.e., fair dealing and fair price.

■ Obviously, there are other litigants, like the plaintiff, who abjured an appraisal and whose rights to challenge the element of fair value must be preserved.[8] Accordingly, the quasi-appraisal remedy we grant the plaintiff here will apply only to: (1) this case; (2) any case now pending on appeal to this Court; (3) any case now pending in the Court of Chancery which has not yet been appealed but which may be eligible for direct appeal to this Court; (4) any case challenging a cash-out merger, the effective date of which is on or before February 1, 1983; and (5) any proposed merger to be

---

**8.** Under 8 *Del.C.* § 262(a), (d) & (e), a stockholder is required to act within certain time periods to perfect the right to an appraisal.

presented at a shareholders' meeting, the notification of which is mailed to the stockholders on or before February 23, 1983. Thereafter, the provisions of 8 *Del.C.* § 262, as herein construed, respecting the scope of an appraisal and the means for perfecting the same, shall govern the financial remedy available to minority shareholders in a cash-out merger. Thus, we return to the well established principles of *Stauffer v. Standard Brands, Inc.,* Del.Supr., 187 A.2d 78 (1962) and *David J. Greene & Co. v. Schenley Industries, Inc.,* Del.Ch., 281 A.2d 30 (1971), mandating a stockholder's recourse to the basic remedy of an appraisal.

### III.

Finally, we address the matter of business purpose. The defendants contend that the purpose of this merger was not a proper subject of inquiry by the trial court. The plaintiff says that no valid purpose existed—the entire transaction was a mere subterfuge designed to eliminate the minority. The Chancellor ruled otherwise, but in so doing he clearly circumscribed the thrust and effect of *Singer. Weinberger v. UOP,* 426 A.2d at 1342–43, 1348–50. This has led to the thoroughly sound observation that the business purpose test "may be . . . virtually interpreted out of existence, as it was in *Weinberger*".[9]

The requirement of a business purpose is new to our law of mergers and was a departure from prior case law. *See Stauffer v. Standard Brands, Inc., supra; David J. Greene & Co. v. Schenley Industries, Inc., supra.*

In view of the fairness test which has long been applicable to parent-subsidiary mergers, *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 109–10 (1952), the expanded appraisal remedy now available to shareholders, and the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate, we do not believe that any additional meaningful protection is afforded minority shareholders by the business purpose requirement of the trilogy of *Singer, Tanzer,*[10] *Najjar,*[11] and their progeny. Accordingly, such requirement shall no longer be of any force or effect.

The judgment of the Court of Chancery, finding both the circumstances of the merger and the price paid the minority shareholders to be fair, is reversed. The matter is remanded for further proceedings consistent herewith. Upon remand the plaintiff's post-trial motion to enlarge the class should be granted.

\*   \*   \*   \*   \*   \*

REVERSED AND REMANDED.

---

9. Weiss, *The Law of Take Out Mergers: A Historical Perspective,* 56 N.Y.U.L.Rev. 624, 671, n. 300 (1981).

10. *Tanzer v. International General Industries, Inc.,* Del.Supr., 379 A.2d 1121, 1124–25 (1977).

11. *Roland International Corp. v. Najjar,* Del. Supr., 407 A.2d 1032, 1036 (1979).