HARRY LEWIS, Plaintiff-Appellant, v. PLAYBOY ENTERPRISES, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—95—0818

Opinion filed March 26, 1996.

Beigel, Schy, Lasky, Rifkind, Goldberg & Fertik, of Chicago (Leigh R. Lasky, of counsel), and Wechsler, Skirnick, Harwood, Halebian & Feffer, L.L.P., of New York, New York (Andrew D. Friedman and Richard B. Brualdi, of counsel), for appellant.

Jones, Day, Reavis & Pogue, of Chicago (Thomas F. Gardner, June K. Ghezzi, and Peter N. Larson, of counsel), and Morris, Nichols, Arsht & Tunnell, of Wilmington, Delaware (A. Gilchrist Sparks III, William M. Lafferty, and Donna L. Culver, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Playboy Enterprises, Inc. (Playboy), is a Delaware corporation with headquarters in Chicago, Illinois, which went public in 1971. During the period relevant to the event that forms the issue in this case, defendant Hugh Hefner (Mr. Hefner) was the "chairman emeritus," founder of Playboy, and the owner of approximately 71% of Playboy's outstanding common stock. Defendant Christie Hefner (Ms. Hefner), Mr. Hefner's daughter, was chairman of Playboy's board of directors (Board), its chief executive officer (management director), and a stockholder. Defendant Richard S. Rosensweig was management director and a Playboy executive vice-president, and defendants Sol L. Rosenthal, William A. Emerson, and John Purcell were members of the Board. Robert Kamerschen, no longer a defendant in this case, was also a member of the Board. Rosenthal, Emerson, Purcell and Kamerschen were not employees of Playboy and received no compensation from it other than customary director's fees.

Sometime in 1988, Playboy engaged the law firm of Latham & Watkins (Latham) and the financial firm of Shearson Lehman Hutton (Shearson) to explore financing alternatives. On November 10, 1988, Playboy's senior management[1] informed the Board about its decision to consider stock restructuring alternatives and to retain Shearson. Senior management considered four different restructuring transactions: a leveraged buyout, a sale of stock to a strategic

---

[1] "Senior management" of Playboy, as used in this opinion, consisted of Howard Shapiro, general counsel; Rebecca Maskey, treasurer; and Jerry Carson, chief financial officer.

partner, adoption of a leveraged employee stock ownership plan transaction, and a dual class stock recapitalization (recapitalization plan or plan). Latham and Shearson both recommended a dual class stock recapitalization plan.

Implementation of the plan would mean the adoption also of two charter amendments, which would effect a "one for two reverse stock split" (the recapitalization plan), and would also double the number of shares and establish two classes of stock, one nonvoting, class B, and one voting, class A. The "one for two reverse split and stock dividend" meant that for every share of stock held on the record date, after recapitalization, the shareholder would have one share of class A voting stock and three shares of class B nonvoting stock. The parties agree that the two classes of stock had "substantially identical rights," including dividend rights, with the exception that class A had one vote per share. Thus, for example, a record date holder of 100 shares would own 50 shares of class A voting stock, and 150 shares of class B nonvoting stock, a total of 200 shares after recapitalization.

Defendants admit that the recapitalization plan did not provide that a majority of the minority of the shareholders would have been required to adopt the plan. However, the plan, as approved, included a "minority protection" provision which required any shareholder acquiring 10% or more of class A voting shares to make a tender offer for a proportionate amount of class B nonvoting shares equal to the highest price paid for the voting shares.

On February 22, 1990, all of the Board members met to discuss the plan. Prior to the meeting, they received a detailed, 34-page memorandum explaining the advantages and disadvantages of the proposed plan. Under a section titled "Possible Disadvantages," the memorandum stated:

> "Mr. Hefner maintains the ultimate right to determine when and whether to sell his controlling interest in the Company, and at what price. If, in the future, Mr. Hefner or his estate or heirs should ever find it necessary or desirable to sell a substantial amount of Existing Stock into the market, such sales could conceivably trigger a control contest for the Company. Because of the Proposal, Mr. Hefner or his estate or heirs would have greater economic flexibility in any future sales of equity, making such a control contest less likely and therefore reducing the possibility that stockholders could, in the event of such a contest, sell their stock at a premium at some future date."

The same section also discussed implementation costs, stockholder transaction costs, and the fact that the stock split would mean that

the stock would trade in the range of $6 to $8 per share and that institutional investors "are less likely to consider stocks trading below $10 per share as desirable portfolio investments." According to the minutes of the meeting, Ms. Hefner:

> "indicated that the plan would give the company the opportunity, for the first time, to use equity without voting dilution for such purposes as financings, acquisitions and employee benefits, and therefore put 'more arrows in the company's quiver.' Ms. Hefner also noted that the proposal had a number of potential benefits related to maintaining continuity of voting control in the event that Mr. Hefner or his estate might want or need to sell a portion of his equity in the future."

The minutes also indicate that Bob Burgess of Latham "advised the Board concerning their obligation to consider the proposal and to make a good faith, informed, independent business judgment concerning whether implementation of the proposal was in the best interests of the Company and all of its stockholders." After fielding questions from the Board, Ms. Hefner and Rosensweig were excused from the meeting in order that the nonmanaging Board could discuss the proposal.

On April 2, 1990, the Board had another meeting to discuss the plan and authorized Playboy to file a consent solicitation statement with the Securities Exchange Commission (SEC). On May 4, 1990, the Board unanimously approved the plan. On May 7, 1990, Playboy announced that the Board had adopted a recapitalization plan, subject to shareholder approval, designed to provide "additional financial flexibility both for the company and Playboy stockholders." A memorandum dated May 7, 1990, was sent to the shareholders along with a "Consent Solicitation Statement." Under a section entitled "Certain Potential Disadvantages of the Proposal" it stated, "implementation of the Proposal will allow Mr. Hefner to (i) continue to exercise control over a majority of the company's voting power even if he chooses to reduce his total equity position significantly."

IEP Consultants, Inc., Playboy's largest shareholder next to Mr. Hefner, sent a letter dated May 31, 1990, addressed to the Board, accusing it of acting secretly to benefit both Mr. and Ms. Hefner, claiming that it was denied "procedural fairness," and accusing the Board members of failing to protect "the interests of the public shareholders against the domination of the interested Hefners."[2]

On June 7, 1990, a majority of Playboy shareholders submitted written consents adopting the recapitalization plan. Excluding the

---

[2]IEP eventually sold its shares to Playboy.

shares held by Mr. and Ms. Hefner, holders of 109,654 shares returned consent forms; 91,437 shares consented to the plan, 13,944 withheld consent, and 4,273 shares abstained. Thus, the plan was approved by a majority of the voting minority shareholders.

In response to the implementation of the plan, Harry Lewis (plaintiff), an owner of Playboy common stock, filed a declaratory judgment action on August 14, 1990, seeking to "reverse" the plan and to recover damages caused by defendants' alleged breach of fiduciary duties. Plaintiff charged that defendants had breached their fiduciary duties in implementing a plan which allegedly granted greater control to the Hefner family, and because Mr. Hefner had the "ultimate veto power" as the majority shareholder, defendants had a "heightened and unflinching duty" to protect the minority shareholders against entrenching control.

Defendants brought a motion for summary judgment (735 ILCS 5/2—1005(b)(West 1994)) seeking a judgment in their favor, and alleging that after lengthy discovery conducted by the parties, there existed no genuine issue of material fact; that plaintiff failed to meet his burden to demonstrate that defendants' actions were not protected under the business judgment rule; and that there was no harm to shareholders, claiming that the purpose of the plan was not to benefit Mr. Hefner, but to enable Playboy to use equity without voting dilution as a means of raising capital, financing acquisitions, and funding employee benefits. In support of their motion, defendants filed the affidavit of Rebecca S. Maskey, Playboy's senior vice-president, "Finance," and Treasurer, which related that the daily closings of classes A and B stock from June 7, 1990, to September 30, 1994, demonstrated a market value increase.

Plaintiff's response to defendants' motion included the affidavit of Candace L. Preston, the executive vice-president of Princeton Venture Research (PVR), a securities and financial analyst firm, which opined that the plan was "not in the best interest of minority shareholders" because it "fostered entrenchment of the voting control of current management." In a supplemental affidavit, Preston pointed out that the market value of the stock declined by 35.78% from June 7, 1990, to August 7, 1990, while the overall stock market declined by only 6.54%. Plaintiff also submitted the affidavit of John B. Torkelsen, president of PVR, who studied the impact of the plan from May 1, 1990, to August 3, 1990, and concluded that the minority shareholders suffered between $10.9 million and $12.9 million in damages as a direct result of investors' reaction to the recapitalization during the three months after the plan was implemented.

Discovery depositions were taken by plaintiff of Ms. Hefner, Pur-

cell, Rosenthal, Rosensweig, and Emerson, and excerpts thereof were used by both parties in the summary judgment proceedings. Ms. Hefner testified that the idea of a recapitalization plan originated with her in 1988, claiming that Playboy needed more financial resources for growth and that there was not much investor interest in the company because it was "thinly traded and closely held." She determined that Playboy needed to raise capital due to "technological change" and "globalization" in the industry and that the company would be limited in "borrowing capacity to achieve those opportunities" unless it was "able to use stock either as currency or to raise capital." After discussing the idea with senior management, Playboy decided to hire outside consultants and interviewed the firms "Lazard Freres," "Allen & Company," and "Saloman" before deciding on Shearson. Ms. Hefner testified that all of the firms interviewed mentioned dual class stock recapitalization as an option. Playboy also considered a leveraged buyout and a sale of some or all of the stock to a "strategic partner." According to Ms. Hefner, Mr. Hefner learned about the plan, "[i]n the same time frame as the [B]oard was informed," *i.e.*, in November 1988.

Purcell testified that he became a member of the Board at Ms. Hefner's request. He stated that the recapitalization plan was in the best interest of Playboy because, "it would enhance the float, [ ] it would provide us additional financing capabilities, [ ] it would enhance the ability of key executives to own equity in the company." He further stated that keeping Mr. Hefner in control was a "defense mechanism to an unfriendly takeover."

When asked about his decision to approve the plan, Rosenthal said, "I was concerned that the proposal should be fair to all of the stockholders"; he believed that "Mr. Hefner's flexibility was being increased by [ ] Playboy instituting this dual class recapitalization structure" because it would give Mr. Hefner the right to sell class B shares but retain voting control.

Rosensweig testified that the Board was aware of IEP's opposition to the plan.

Emerson acknowledged that Mr. Hefner was not at the Board meetings when the recapitalization plan was discussed; however, when he first heard about the plan, he was told that Mr. Hefner was in favor of it. He testified that the purpose of the plan was to give Playboy more flexibility financially, and "to insulate the editorial function from any sort of radical change in the management *** or a profound change of any sort in management of the company." An editor himself, Emerson thought that keeping Mr. Hefner in control of Playboy would benefit the company because, a "sudden outside interference might be disastrous."

In her ruling, the circuit judge first acknowledged that "summary judgments in a complex corporate litigation case should be granted sparingly" and went on to hold as applicable Delaware's "business judgment rule,"[3] which "precludes a court from imposing itself unreasonably in the business affairs of the corporation *** [and] establishes a strong presumption in favor of the actions taken by corporate directors." The court also stated that it was aware that directors have a duty to inform themselves before making a business decision and "must act with the requisite care in the discharge of their duties," citing *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).

In granting defendants' motion for summary judgment, the judge noted that the material facts presented to her were undisputed and that no evidence was submitted to support plaintiff's position that the plan was adopted to benefit Mr. Hefner at the expense of the minority shareholders: "The evidence is clear that Mr. Hefner will receive the same benefit as all the other shareholders of the corporation." The court also found that there was no interest on the part of Mr. Hefner which conflicted with those of the minority shareholders, and it found no evidence that he exerted his power over the Board as in *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986). She concluded that the "evidence was clear" that the Board considered several alternatives in addition to the plan and that it had a "substantial amount of outside information and counsel from both the law firm and the investment banking groups" and was "well aware of its fiduciary duty to all shareholders when it voted to implement the plan." The judge held that it did not matter whether Mr. Hefner elected the Board members because a board is considered interested only where members receive a personal financial benefit not equally shared by the stockholders, and plaintiff offered no evidence thereon, citing *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). The fact that they received a director's fee, she determined, "does not create a disqualifying financial interest." The judge also noted that: the record of three Board meetings reflected that it was not rushed into the decision; there were no time restraints; a majority of the minority of the shareholders consented to the plan; the recapitalization did not alter the voting power of any stockholder; and the plan treated all stockholders equally.

This court's review of a trial court's entry of summary judgment is *de novo. In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736

---

[3]The parties do not dispute the fact that Delaware law applies to the substantive issues in this case.

(1993). The motion is granted only when " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986), quoting Ill. Rev. Stat. 1983, ch. 110, par. 2—1005(c) (now 735 ILCS 5/2—1005 (West 1994)).

■ ■ Plaintiff claims that there are disputed issues of material fact which preclude summary judgment because there is a question as to whether the plan was "entirely fair to all shareholders" and whether the Board members breached their fiduciary duties because, according to plaintiff, the primary purpose of the plan was to benefit Mr. Hefner and his estate. Yet whether defendants' activities were entirely fair and whether defendants breached their fiduciary duties are issues of law and not of fact. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 364 (Del. 1993), *modified on reh'g in part & reh'g denied in part*, 636 A.2d 956 (Del. 1994)(Although breach of fiduciary duty is an issue of law, it is a "fact-dominated" one). The business judgment rule, which "operates both as a procedural rule of evidence and a substantive rule of law," creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812; *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 499 (Del. Ch. 1990). The presumption attaches to a "director-approved transaction *** in the absence of any evidence of 'fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment.' " *Citron*, 584 A.2d at 499, quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1985). Its purpose is to "preclude a court from imposing itself unreasonably on the business and affairs of a corporation," and is designed to create a "powerful presumption in favor of actions" taken by a loyal and informed board. *Cede*, 634 A.2d at 360-61.

On January 29, 1996, just prior to oral argument in this case, the supreme court of Delaware handed down *Williams v. Geier*, No. 380,1994, slip op. (Del. January 23, 1996),[4] a case we find to be on point. *Williams* holds that summary judgment was properly awarded and that the business judgment rule was properly applied by the trial court to a board of directors' approval of a decision to recapitalize, whereby, as in the instant case, the plan allowed a majority bloc to sell a portion of its holdings while retaining control of the company.

---

[4]Both parties were given the opportunity to address this case in supplemental briefs.

*Williams*, No. 380,1994, slip op. at 4. Citing the business judgment rule, the Delaware Supreme Court refused to second-guess the decision because the board and shareholders who voted in favor of recapitalization did so after being fully informed that it would concentrate voting power in the hands of long-term shareholders, including descendants of the company's founder, his in-laws, and certain trusts that he had created. *Williams*, No. 380,1994, slip op. at 11.

Plaintiff argues that *Williams* is distinguishable because there is "substantial evidence" to support the claim that the primary purpose of the recapitalization was to benefit Mr. Hefner and his estate and because the Board members were not fully informed prior to voting for the plan. Prior to the trial court's decision to award summary judgment to defendants in this case, plaintiff deposed all the Board members and had an opportunity, through other means of discovery, to enlarge upon his argument that the Board members had personal interests to gratify and were acting solely on Mr. Hefner's behalf.

■ Based on the record and for the reasons discussed below, we find no evidence of improper motives on the part of the Board members, nor do we find any evidence that they were not adequately informed. Instead, the record clearly demonstrates that the Board members and shareholders were in fact fully informed about the effect of the recapitalization plan on Mr. Hefner's control. The Board members deposed that although they were aware that the purpose of the plan was to grant Playboy more financial flexibility while enabling Mr. Hefner to remain in control of the company, they believed this to be in the best interest of all shareholders. For example, Emerson testified that he thought keeping Mr. Hefner in control of the company would "insulate the editorial function from any sort of radical change in the management." Also, the shareholders were fully informed that Mr. Hefner's control was one of the "Certain Potential Disadvantages of the Proposal."[5] However, in spite of that potential disadvantage, a majority of the minority shareholders approved the transaction.

Plaintiff further complains that the Board members failed to apprise themselves of material facts relating to the consequences of the transaction. In support of this, plaintiff alleges that there was no meaningful inquiry into the basis for Latham's and Shearson's opinions. But plaintiff has failed to demonstrate the existence of any

---

[5]As stated earlier, this section read, "implementation of the Proposal will allow Mr. Hefner to (i) continue to exercise control over a majority of the company's voting power even if he chooses to reduce his total equity position significantly."

genuine issue of material fact as to the inadequacy of the research, documentation, and opinions of Latham and Shearson. On the contrary, the record reveals that the Board members were fully informed that the reverse stock split would mean that the shares would trade for under $10, which would make it unappealing to institutional investors. Board members also were apprised of the alternatives that were considered and why they were rejected by Playboy management, Latham, and Shearson.

Plaintiff further alleges that the Board members breached their fiduciary duties because they "never considered establishing a special committee of outside directors" and never considered requiring a majority of the minority vote (a "minority veto"). However, absence of a minority veto does not amount to a breach of fiduciary duty. *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986); see also *Williams*, No. 380,1994, slip op. at 35-36 (There is no requirement that a majority of a minority of shareholders approve a recapitalization plan where an independent disinterested board approves it). Regardless, a majority of the voting minority actually approved the plan. Furthermore, we note that plaintiff cites no authority in support of his argument that there must be a "special committee of outside directors."

Although the discovery depositions demonstrate that the Board members' vote was based on the interests of Playboy and all the shareholders equally, even if, as plaintiff asserts, the primary purpose of the recapitalization plan was to benefit the Hefner family, the law is clear that "an approving vote of a majority of informed and disinterested directors shall remove any taint of director or directors' self-interest in a transaction." *Cede*, 634 A.2d at 365. As stated earlier, the Board unanimously approved the recapitalization plan. Mr. Hefner was not a member of the Board when the recapitalization plan was proposed and approved. Even assuming that Ms. Hefner was an "interested" member motivated "primarily, if not solely" to help her father, the remaining Board members were disinterested; therefore, under *Cede*, their majority approval does not warrant our holding that the Board breached its fiduciary duty in approving the transaction.

Plaintiff also maintains that none of the Board members was disinterested because Mr. Hefner, as controlling shareholder, had the power to "appoint" the members to the Board. However, as defendants point out, a controlling shareholder "does not strip the directors of the presumptions of independence." *Aronson*, 473 A.2d at 815. The Delaware Supreme Court has held that a plaintiff must allege facts that would support a personal or other relationship demonstrat-

ing that the directors were "beholden to the controlling person." *Aronson*, 473 A.2d at 815. Despite the fact that plaintiff deposed the shareholders and had ample time for other discovery, plaintiff has failed to even allege any such facts.

Indeed, the fact is that these Board members were, in fact, disinterested. A "disinterested" director cannot appear on both sides of a transaction nor "derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812. Excluding Ms. Hefner and Rosensweig, the Board members were not employees of Playboy and were paid only customary director's fees. Furthermore, their testimony given at their depositions indicates that they were concerned about doing what was best for the company as a whole, and what was best for all the shareholders.

Plaintiff argues that the trial court should have applied the "entire fairness" standard to the Board's decision instead of the business judgment rule. In determining whether the transaction at issue was "entirely fair," a court looks at two basic aspects: "fair dealing" and "fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983), *subsequent appeal after remand*, 497 A.2d 792 (Del. 1985). Fair dealing relates to "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Fair price relates to "economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711.

Plaintiff bears the burden to rebut the business judgment rule in order to invoke the entire fairness standard. *Cede*, 634 A.2d at 361. In order to do this, plaintiff must provide evidence that the members of the Board breached at least one of their fiduciary duties—good faith, loyalty, or care. *Cede*, 634 A.2d at 361. Absent such evidence, the business judgment rule applies and "our courts will not second-guess these business judgments." *Cede*, 634 A.2d at 361. In *Williams*, the Delaware Supreme Court found that the entire fairness doctrine did not apply where, as here, an informed independent board acted with the proper care in approving a recapitalization plan. *Williams*, No. 380,1994, slip op. at 43-44. Accordingly, plaintiff having failed to demonstrate the existence of any genuine issue of material fact which would render him even the possibility of meeting his burden to overcome the business judgment rule under *Williams*, and the applicable law being of no support to his position, we hold that the trial

court did not err in applying the business judgment rule and in granting summary judgment in favor of defendants.

For all of the foregoing reasons, the decision of the circuit court is affirmed.

Affirmed.

DiVITO and BURKE, JJ., concur.