**SIEG COMPANY, Appellee,**

v.

**Denis M. KELLY, Individually and as Successor Trustee of the Ann M. Kelly Grantor Trust, and John F. Kelly, Appellants.**

**No. 96–61.**

Supreme Court of Iowa.

Sept. 17, 1997.

Gerald J. Newbrough and Thomas M. Zurek of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellants.

Michael L. Noyes and Teri A. Sandeman of Noyes & Gosma, Davenport, for appellee.

Considered by LARSON, P.J., and CARTER, SNELL, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

This action is brought pursuant to Iowa Code chapter 490 (1993) to obtain a court appraisal of the fair value of stock owned by appellants. Appellants are shareholders of Sieg–Fort Dodge Company who dissented to the merger of Sieg–Fort Dodge into appellee Sieg Company (hereinafter "Sieg"). The dissenters rejected the price offered by Sieg for the purchase of their stock and as a consequence, Sieg filed this appraisal action. After a bench trial resulted in a valuation unsatisfactory to the dissenters, they appealed the district court's judgment, claiming error not only in the court's appraisal, but also in the court's refusal to award attorney fees. Finding no error, we affirm.

### I. *Background Facts.*

At the time of the events giving rise to this action, Sieg was a large wholesale distributor of automobile parts and supplies. Prior to 1989, it did business through several independently-managed subsidiaries. Sieg–Fort Dodge was one of Sieg's subsidiaries through Sieg's majority ownership of Sieg Rockford Co.; Sieg Rockford owned 86% of Sieg–Fort Dodge. Appellants Denis M. Kelly, the Ann M. Kelly Grantor Trust, and John F. Kelly (hereinafter "Kellys") were minority shareholders of Sieg–Fort Dodge.

Historically, Sieg–Fort Dodge was very successful. Through early 1989, it had sizable net profits and paid dividends to its shareholders each year. Sieg was also profitable until the late 1980s when large losses on its nonautoparts-business investments put it on the verge of bankruptcy. Sieg hired Maddus Sulg as its new president to return it to solvency.

Sulg implemented remedial measures to address Sieg's problems, including the con-

solidation of its operations. This consolidation was accomplished by merging several subsidiaries into Sieg.[1] Sieg–Fort Dodge and Sieg Rockford survived these mergers, and Sieg–Fort Dodge actually grew through its acquisition of the assets and operations of several of the merged subsidiaries. These acquisitions occurred through stock-for-stock transactions, using newly-issued Sieg–Fort Dodge stock. (The dissenters now claim the issuance of this stock violated their preemptive stock rights.)

After these mergers were completed, Sieg began to manage and operate Sieg–Fort Dodge and Sieg Rockford as divisions of Sieg. Sieg replaced Sieg–Fort Dodge's board members and officers with individuals who were also board members and officers of Sieg. Sulg became chairman of the board and the chief executive officer of Sieg–Fort Dodge.

During this same period, Sieg began to collect a 4% management fee from its subsidiaries and a 1% charge for the use of its name and service mark. It also lowered prices on the products sold by it and its surviving subsidiaries to increase their market share. These measures had the effect of eliminating Sieg–Fort Dodge's profit margin. Consequently, by 1993, Sieg–Fort Dodge was no longer an autonomous, profitable company; it had become an unprofitable business managed by Sieg.

Despite Sulg's efforts, Sieg continued to lose money. In August 1993, the company fired Sulg and hired a new chief executive officer, Douglas Kratz. Kratz's mission was to reverse Sieg's downward spiral. Kratz implemented several badly-needed management systems and negotiated some breathing room with Sieg's bankers and vendors who were owed over $10 million. Nevertheless, at the end of November, Sieg's principal lender demanded payment of its $7 million loan. Kratz then found a new lender who agreed to loan Sieg $10 million on certain conditions. These conditions included requirements that Sieg raise an additional $2.25 million of capital and that some of the

---

1. A dispute similar to the one before us arose between the same parties with respect to the merger of two other subsidiaries into Sieg. Our

opinion in that case contains additional background facts not repeated here. *See Sieg Co. v. Kelly,* 512 N.W.2d 275, 276–77 (Iowa 1994).

funds raised be used to merge Sieg–Fort Dodge and Sieg Rockford into Sieg.

Kratz presented a reorganization plan to Sieg's board that would fulfill the conditions of Sieg's new lender. Pursuant to this plan, approved by Sieg's directors, the required capital was raised by the sale of Sieg preferred stock. This stock was purchased by Kratz, other directors and officers of Sieg, and by a close friend of Kratz. Sieg–Fort Dodge and Sieg Rockford were to be formally merged into Sieg. Part of the proceeds from the sale of the Sieg preferred stock was set aside to buy out the subsidiaries' minority shareholders.

To accomplish the merger, all Sieg–Fort Dodge shareholders were offered cash or Sieg stock for their shares. The cash price was $22.60 per share, Sieg's estimate of the fair value of Sieg–Fort Dodge stock. This figure was approximately 73% of book value. The Kellys rejected Sieg's offer and demanded $184.59 per share. On February 21, 1994, the merger of Sieg–Fort Dodge was approved by its shareholders. The formal merger occurred the next day.

Following the merger, Sieg received an unsolicited inquiry from a business broker, asking if Sieg was willing to sell its assets. In May 1994, Sieg representatives met with representatives of A.P.S., which does business under the name of Big A Autoparts. By September, Sieg had sold its assets, excluding real estate, to A.P.S. A.P.S. paid book value for these assets, plus a $10 million premium for market share, goodwill, and distribution network, also referred to as Sieg's enterprise or franchise value.

Additional facts will be discussed in connection with our consideration of the issues raised by the Kellys in this appeal.

## II. *History of Proceedings.*

The merger of Sieg–Fort Dodge was accomplished pursuant to the provisions of Iowa's Business Corporation Act, Iowa Code chapter 490. Chapter 490 gives shareholders the right to dissent from certain corporate actions and be paid the "fair value" of their shares in the company. *See* Iowa Code §§ 490.1301—.1331. If the dissenters and the corporation cannot agree on the fair value of the dissenters' shares, the corporation must commence an action to determine fair value. *Id.* § 490.1330(1). The present case is such an action.

Following a bench trial, the district court established the fair value of the Kellys' stock to be $62.67 per share. It denied the Kellys' request for an award of attorney fees. *See id.* § 490.1331(2) (allowing an award of attorney fees against corporation if certain conditions are met).

The Kellys appealed. They contend (1) the trial court should have adopted their expert's opinion of fair value, and (2) the trial court erred in failing to award attorney fees. The error claimed with respect to the court's appraisal of the dissenters' stock is twofold: (1) the trial court should have ignored the disastrous consequences of Sieg's management of Sieg–Fort Dodge in the years prior to the merger; and (2) the court should have attributed a proportionate share of the $10 million premium subsequently paid by A.P.S. for Sieg's franchise value to the franchise value of Sieg–Fort Dodge.

## III. *Scope of Review.*

■ Actions to determine the value of dissenters' shares pursuant to section 490.1330 are at law. *Sieg Co. v. Kelly,* 512 N.W.2d 275, 278 (Iowa 1994) [hereinafter referred to as *Sieg I* ]. Consequently, our review is for errors of law. *Id.* The district court's findings of fact are binding on us if supported by substantial evidence. Iowa R.App. P. 14(f)(1).

## IV. *Determination of Fair Value.*

We begin our consideration of the Kellys' challenge to the court's appraisal of their stock with a review of the applicable law governing such an appraisal. The focus of an action under section 490.1330 is the determination of the "fair value" of the dissenters' shares. *See* Iowa Code § 490.1330(1) (providing for a court appraisal of the "fair value" of dissenters' shares). The term "fair value" is defined in chapter 490:

> "*Fair value*", with respect to a dissenter's shares, means the value of the shares im-

mediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.

*Id.* § 490.1301(4). This definition is taken from the Model Business Corporation Act. 3 Model Bus. Corp. Act Ann. § 13.01(3), at 1356 (3d ed. Supp.1986) [hereinafter Model Bus. Corp. Act].

A. *Factors to be considered.* Initially, it is important to remember that the date of valuation is "immediately before" the corporate action to which the dissenters object. Consequently, it is the value of the stock on that date, not some prior or subsequent date, that is important. This fact influences the events and factors that may properly be considered by the court, as we now discuss.

■ The objective of a fair-value determination "is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders." *Woodward v. Quigley,* 257 Iowa 1077, 1085, 133 N.W.2d 38, 42 (quoting *Warren v. Baltimore Transit Co.,* 220 Md. 478, 154 A.2d 796 (1959)), *modified on reh'g,* 257 Iowa 1077, 136 N.W.2d 280 (1965). As we have observed on prior occasions, there is no predominant formula for arriving at fair value. *Security State Bank v. Ziegeldorf,* 554 N.W.2d 884, 888 (Iowa 1996); *Sieg I,* 512 N.W.2d at 278. The approaches to stock valuation usually relied upon by the court are "(1) market value of the stock; (2) net asset value of the corporation; and (3) investment value." *Security State Bank,* 554 N.W.2d at 888–89. The usefulness of any particular approach depends on the facts and circumstances of each case. *Id.* at 889. The court should consider any relevant factor not inconsistent with the statutory definition of "fair value." *See Sieg I,* 512 N.W.2d at 279 (stating "trial courts should consider . . . all relevant factors that may influence the valuation"). Some of the factors we have suggested a court should consider in its analysis include

the rate of dividends paid, the security afforded that dividends will be regularly paid, the possibility that dividends will be increased or diminished, the size of the accumulated surplus applicable to the payment of dividends, the record of the corporation, *its prospects for the future,* the selling price of stocks of like character, the value of its assets, book values, market conditions, [and] the reputation of the corporation.

*Id.* (emphasis added).

■ As the emphasized words from this listing of factors illustrate, the future opportunities for the company are certainly a consideration in setting the value of the company's stock. As one court has noted, a determination of fair value "must reflect that a necessary result of dissenting is the dissenters' loss of their opportunity to share in the corporation's prospects." *Columbia Management Co. v. Wyss,* 94 Or.App. 195, 765 P.2d 207, 212 (1988). Thus, the relevant consideration is what prospects could reasonably have been anticipated as of the date of valuation, not what opportunities are actually realized subsequent to the corporate action.

B. *Effect of merger on valuation.* The second part of the definition of "fair value" of particular relevance to this case is the exclusion from the calculation of fair value of "any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Iowa Code § 490.1301(4). This language requires the court, in making its appraisal of the dissenters' stock, to ignore any increase or decrease in the value of the dissenters' stock caused by the anticipated corporate action. The only exception to this rule is where it would be inequitable not to consider such appreciation or depreciation in value.

V. *Testimony of Expert Witnesses And Court's Evaluation of That Testimony.*

■ With these principles in mind, we now turn to the facts of this case. Because the Kellys claim on appeal that the trial court erred in not adopting the opinion of their expert as to the fair value of their stock, it is useful to review the testimony of each party's

expert witness and the court's analysis of the experts' opinions.

A. *Sieg's expert.* Sieg's expert witness, Richard Maroney, Jr., testified the Kellys' stock was worth $40.74 per share. In arriving at this figure, he relied primarily on a price-to-book multiple approach. The record shows this valuation method is a "market comparable approach." Maroney testified he could not use a net asset valuation because the inventory and fixed assets of Sieg–Fort Dodge had not been appraised; consequently, he had insufficient information to perform this type of valuation. He also rejected an investment or earnings-based approach because the company had not been profitable in recent years.

In determining value using a price-to-book multiple, Maroney first calculated the book value of Sieg–Fort Dodge's assets, using the most recent figures from December 1993. To this figure he made two adjustments. First, he added back a portion of the LIFO reserve to the book value of Sieg–Fort Dodge's inventory, in effect restating the inventory to a FIFO basis.[2] He did not add back the entire LIFO reserve, as would typically be done, because he believed Sieg–Fort Dodge's LIFO reserve was too high compared to comparable companies. He gave several reasons for Sieg–Fort Dodge's unusually high LIFO reserve, including the slow turnover of its inventory and the age of its inventory.

The second adjustment made by Maroney to Sieg–Fort Dodge's book value was a 20% discount to reflect the company's operating losses since 1990. Based on the magnitude of these losses, Maroney thought Sieg–Fort Dodge's equity could be eliminated in less than a year.

Maroney then calculated the multiplier that would be applied to the adjusted book value to arrive at a per share value. He chose five comparable companies to use as guidelines. Each, however, was more profitable and in better financial condition than Sieg–Fort Dodge. Consequently, Maroney started with the lowest multiple from these

companies and then reduced that multiple by an additional 32% to reflect Sieg–Fort Dodge's recent operating losses and reduced equity.

When Maroney applied the resulting multiplier to his adjusted book value, he arrived at a per share value of $62.67. Maroney then discounted this figure by an additional 35% based on the lack of market for shares in a closely-held corporation. His final opinion of fair value was $40.74.

B. *The Kellys' expert.* The Kellys retained Steve Givens to value their stock. Givens used three valuation methods: net asset value, investment value, and market value. He concluded, however, that a market approach using a price-to-book ratio was the most reliable and he adopted the figure calculated under this method as his opinion of fair value. We start, therefore, with a review of Givens' appraisal of the Kellys' stock under a market valuation method.

In determining book value for purposes of applying a price-to-book ratio, Givens added back a larger portion of the LIFO reserve than had Maroney to restate Sieg–Fort Dodge's inventory on a FIFO basis. To arrive at a multiplier, he considered the same comparable companies identified by Maroney. Rather than using the lowest multiplier of these companies and discounting that figure, as Maroney had done, Givens used an average of the multipliers of the comparable companies. Using the resulting price-to-book ratio, Givens arrived at a per share value of $220.39. He did not employ the marketability discount applied by Maroney.

As noted above Givens used the net asset value and investment value approaches to merely confirm his calculation of value under the market approach. On appeal, however, the Kellys argue strenuously that these alternate approaches should have been given more consideration by the trial court. They claim the court mistakenly ignored these valuations because they were based on a consideration of the A.P.S. sale, which occurred subsequent to Sieg–Fort Dodge's merger

---

**2.** For an explanation of the LIFO and FIFO methods of valuing inventory, see *Sieg I,* 512

N.W.2d at 280–81, 283.

into Sieg. Consequently, we will briefly summarize Givens' testimony about these methods of valuation.

In determining net asset value, Givens was hampered by the lack of any appraisal of Sieg–Fort Dodge's assets. Consequently, he relied on the book value of the company's assets, making only the adjustment noted above to restate the inventory to a FIFO basis. Next Givens used the A.P.S. sale to assign a value to Sieg–Fort Dodge's market share, an intangible asset. To value this item, he took a proportionate share of the $10 million premium paid by A.P.S. when it purchased a portion of Sieg's assets. He then added this figure to the value of Sieg–Fort Dodge's other assets to arrive at a net asset value. The net asset figure was then divided by the number of Sieg–Fort Dodge shares, not including the shares issued to Sieg in the early 1990s. This calculation resulted in a per-share value of $221.59.

In determining the investment value of Sieg–Fort Dodge stock, Givens again used the same comparable companies identified by Maroney. Using this data, but without any discount to reflect Sieg–Fort Dodge's lack of profitability, Givens arrived at an investment value of $251.56 per share. Givens also did an alternate calculation using the A.P.S. sale. Considering that sale as reflective of Sieg–Fort Dodge's franchise value, Givens set the per share investment value of the Kellys' stock at $289.95.

C. *Trial court's decision.* The trial court found Maroney's approach "more convincing and supported by the evidence," with one exception. The court did not believe that a

marketability discount was permitted under Iowa law. Consequently, the trial court adopted Maroney's pre-marketability-discount figure of $62.67.[3]

The court rejected Givens' opinion for the general reason that Givens viewed Sieg–Fort Dodge's financial condition "as if selected 'related party dealings' had not occurred." The court refused "to ignore the reality of the years preceding the merger." More specifically, the court found Givens' use of a multiplier based on an average of the comparable companies to be unrealistic because the comparable companies were all profitable whereas, at the time of the merger, Sieg–Fort Dodge was not.[4] The court also rejected any calculation based on the A.P.S. sale for reasons we shall discuss later.

Clearly, there is substantial evidence to support the trial court's determination of fair value. Maroney's testimony, backed up by the evidence introduced at trial, supplies this support. Thus, on appeal the Kellys must rely on a demonstrated legal error to obtain a reversal of the trial court's decision. With respect to valuation, they allege two errors: (1) the court refused to exclude the depreciation in the value of Sieg–Fort Dodge stock caused by the actions of Sieg's officers and directors in the years prior to the merger; and (2) the court refused to consider the postmerger A.P.S. sale as evidence of the value of Sieg–Fort Dodge stock. We turn now to a discussion of these contentions.

## VI. *Actions of Sieg Prior to Merger.*

■ A. *Consideration of premerger depreciation in value.* The Kellys claim the

3. Sieg did not cross-appeal to challenge the court's rejection of this discount, which was based on the lack of market for *all* shares of this closely-held company. Therefore, we do not rule on whether such a discount is permissible under chapter 490.

4. The Kellys complain that the trial court ignored our discussion of an appropriate multiplier in *Sieg I. See Sieg I*, 512 N.W.2d at 283–85. In *Sieg I*, the trial court had accepted Givens' opinion that the appropriate multiplier was an average of the price-to-book ratios of three comparable companies. *Id.* at 285. (Two of the three comparable companies utilized in *Sieg I* were also used by the experts to value Sieg–Fort Dodge.) On appeal, we found substantial evi-

dence to support the trial court's rejection of the opinion of Sieg's expert, who had relied on the lowest ratio of the comparable companies. *Id.* The Kellys apparently believe our prior opinion is dispositive here. We disagree. Two different subsidiaries were being valued in *Sieg I*, and they had financial histories unlike Sieg–Fort Dodge. Therefore, the price-to-book ratios of the comparable companies have different degrees of relevancy in valuing Sieg–Fort Dodge stock than they had in *Sieg I*. The appraisal of stock is highly fact specific. Consequently, our discussion of the value of stock of different subsidiaries in *Sieg I* is not determinative of the appraisal before us in this case.

actions of Sieg in the years prior to Sieg–Fort Dodge's merger into Sieg depreciated the value of Sieg–Fort Dodge and its stock.[5] At trial, they claimed the decreased value of Sieg–Fort Dodge stock resulting from these actions should be ignored by the trial court in its appraisal of the Kellys' stock. Their expert, Givens, followed this approach in two ways: (1) in calculating the number of outstanding Sieg–Fort Dodge shares, he did not include the additional shares issued in 1990 and 1992 at the direction of Sieg; and (2) he ignored Sieg–Fort Dodge's operating losses in determining whether other autoparts companies were comparable for purposes of an appropriate price-to-book multiplier and an appropriate return-on-investment percentage.

The trial court correctly observed that the Kellys want their stock appraised as if the events between 1989 and the date of the merger had not occurred. Of course, chapter 490 requires that the court value the dissenters' shares as of 1994, not as of some more favorable prior date. Moreover, as the comments to the Model Business Corporation Act state, the effect of corporate actions, other than acts to effectuate the transaction itself, may be considered. Model Bus. Corp. Act § 13.01 cmt. (3), at 1358 (1984) ("Consideration of appreciation or depreciation which might result from *other* corporate actions is permitted.") (emphasis added). Therefore, unless the statutory exclusion of depreciation in anticipation of the corporate action applies, the trial court could not ignore the events which shaped Sieg–Fort Dodge as it existed immediately prior to the merger.

B. *Exclusion of depreciation in anticipation of merger.* That brings us to the statutory exclusion from a fair-value determination of any depreciation "in anticipation of the corporate action," here a merger. *See*

Iowa Code § 490.1301(4). We think the phrase, "in anticipation of," limits this exclusion to depreciation caused by the merger. Accordingly, if the value of the Kellys' stock depreciated *because of* the prospective merger, that depreciation must be excluded. *See Oakridge Energy, Inc. v. Clifton,* 937 P.2d 130, 134 (Utah 1997) (interpreting identical language to exclude increases or decreases in value *caused by* the corporate action).

The trial court considered this exclusion and found it did not apply because Sieg's post-1989 management of Sieg–Fort Dodge was not in anticipation of the merger. Substantial evidence supports this factual finding. First of all, none of the corporate actions of which the dissenters complain were part of the merger itself; they all predated the initiation of the merger.[6] Although the evidence shows the merger of Sieg–Fort Dodge into Sieg was planned for some time prior to 1994, there was abundant evidence that the specific actions taken by management from 1989 to 1994 were done to keep Sieg out of bankruptcy and maintain the viability of its distribution network, not to depress the value of Sieg–Fort Dodge stock held by the minority shareholders so the merger could be accomplished at a lower cost. Consequently, any depreciation of Sieg–Fort Dodge and its stock was a product of the decisions made by management for business reasons unrelated to an anticipated merger.

■ C. *Exclusion of depreciation under principles of fairness.* Notwithstanding the inapplicability of the statutory exclusion, the Kellys contend it would be inequitable not to exclude the premerger depreciation in their stock. They argue "fair value" is that value which "is fair and equitable under all the circumstances." They rely principally on the

---

5. These actions included alleged mismanagement, improper and unauthorized issuance of Sieg–Fort Dodge stock, violation of the Kellys' preemptive stock rights, and breach of fiduciary duty by Sieg/Sieg–Fort Dodge officers and directors.

6. The specific corporate actions that the dissenters claim should be considered and the effects of them excluded are (1) the management and service mark fees, (2) the cessation of dividend payments to Sieg–Fort Dodge shareholders, (3) the reduction in prices for products sold by Sieg's subsidiaries, (4) Sieg's decision to take over the management of Sieg–Fort Dodge and its alleged mismanagement of Sieg–Fort Dodge's operations, (5) the issuance of additional capital stock in Sieg–Fort Dodge, and (6) Sieg–Fort Dodge's purchase of the assets of other merged subsidiaries.

Delaware case of *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983).

In *Weinberger,* the Delaware Supreme Court adopted an appraisal method that considered "fair dealing" as well as "fair price." 457 A.2d at 711. The court defined "fair dealing" to include consideration "of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* The Kellys point out that the Model Business Corporation Act, which was adopted in Iowa, was intended to incorporate this fairness analysis into a determination of fair value. *See* Model Bus. Corp. Act § 13.01 cmt. (3), at 1358 (1984) (citing *Weinberger* ). Therefore, they argue, the court should properly focus on all conduct of the corporation to determine a fair value to pay the minority shareholders.

We read *Weinberger* differently. *Weinberger* focused on whether the *price* offered by the corporation was fair in light of the surrounding circumstances. The court's evaluation of the fairness of the corporation's dealing with the minority shareholders was not intended to be a vehicle to evaluate every corporate action and its impact on the *value* of the stock. The *Weinberger* court was clear that the narrow remedy provided by an appraisal action does not encompass claims of fraud, self-dealing or breach of fiduciary duty; those claims are separate and distinct and can be redressed *outside* the appraisal remedy. *Weinberger,* 457 A.2d at 714; *accord Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1189 (Del.1988) (holding trial court correctly denied motion to amend appraisal action to include claims of conspiracy, illegality, fraud, and breach of fiduciary duty).

We interpret our statute similarly. An appraisal action is not an equitable proceeding wherein the court assigns a value to the dissenters' stock that it considers "fair and equitable under all the circumstances." *See Sieg I,* 512 N.W.2d at 278 (appraisal action is not an equitable proceeding). An appraisal action is one at law to determine the fair value of the dissenters' shares. *Id.; see Cede & Co.,* 542 A.2d at 1186 ("An appraisal pro-

ceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings."); *Bayberry Assocs. v. Jones,* 783 S.W.2d 553, 561 (Tenn.1990) (same). Because the statute defines the term "fair value," the court must appraise the dissenters' stock within the confines of this definition and is not at liberty to make an award that will, in the court's opinion, do equity between the parties.

Here, the trial court correctly began its analysis with a determination of the value of the dissenters' stock as of a date immediately prior to the merger. It then considered whether any depreciation in the stock's value occurring before the merger was in anticipation of the merger. Because it was not, that depreciation could not be excluded from a calculation of fair value. Only if the trial court had decided the depreciation resulted from the anticipated merger, and therefore would normally be excluded from consideration, should it have gone on to consider whether exclusion of the depreciation would be inequitable. *See* Iowa Code § 490.1301(4) (stating "unless *exclusion* would be inequitable") (emphasis added). Equitable considerations do not affect the materiality of other corporate actions distinct from the merger; the effects of those actions on fair value must be included in the valuation process. If the Kellys believe the officers and directors of Sieg and Sieg–Fort Dodge are responsible for premerger mismanagement and breach of fiduciary duty resulting in harm to Sieg–Fort Dodge, then those claims must be presented in a separate action; they are not appropriately considered in an appraisal action under chapter 490. *Davis–Eisenhart Mktg. Co. v. Baysden,* 539 N.W.2d 140, 143 (Iowa 1995) ("We hold that any claim of breach of fiduciary duty must be presented in a separate action and that it is not appropriate to consider it in a case under section 490.1330 to value the shares of a dissenting shareholder."); *accord Armstrong v. Marathon Oil Co.,* 32 Ohio St.3d 397, 513 N.E.2d 776, 798 (1987); *cf. Cede & Co.,* 542 A.2d at 1189 ("A determination of fair value does not involve

an inquiry into claims of wrongdoing in the merger.").

## VII. *The A.P.S. Sale.*

■ The Kellys claim the $10 million premium paid by A.P.S. for Sieg's assets "is highly probative, if not determinative, of the Sieg Companies' enterprise/franchise value as of the date of the merger." Because one-third of the assets sold to A.P.S. were formerly owned by Sieg–Fort Dodge, the dissenters conclude Sieg–Fort Dodge had a "one-third interest in the Sieg Companies' enterprise/franchise value." They claim it is unfair to deny Sieg–Fort Dodge stockholders their share of this $10 million payment.

The trial court refused to consider the A.P.S. sale in appraising the Sieg–Fort Dodge shares because the court found the purchase price paid by A.P.S. reflected several intangible factors beyond the value of Sieg's assets as part of a going concern. We find no error in this decision.

As we stated earlier in connection with our discussion of the statutory definition of "fair value," dissenters are to be compensated for the loss of their opportunity to share in the company's future prospects; they are not entitled to actually share in the realization of those future prospects. *See Oakridge Energy,* 937 P.2d at 134 ("[A] dissenting shareholder disclaims both the burden and the benefit of the disfavored corporate action."). Consequently, the Kellys were not entitled to a proportionate share of the $10 million premium paid by A.P.S. merely because such a payment occurred. The Kellys concede this point on appeal, but argue the trial court should have considered the sale as determinative or at least probative of the value of Sieg–Fort Dodge stock. The real question here is the relevancy of the postmerger sale of a portion of Sieg's assets.

The effect of postmerger offers was considered by the Supreme Court of Delaware in *Kahn v. Household Acquisition Corp.,* 591

A.2d 166, 175 (Del.1991). In *Kahn,* the surviving company had received postmerger offers to purchase the merged subsidiary. 591 A.2d at 175. The appellate court approved the trial court's refusal to consider these offers: "Such discussions and overtures were not admissible as valid indications of merger-date fair value because they were not 'known or susceptible of proof as of the date of the merger,' but instead arose 'from the accomplishment or expectation of the merger.'" *Id.* (citations omitted). A similar rationale supports the trial court's decision here.

The trial court found as a fact that the interest of A.P.S. was unknown to Sieg's management and board of directors until *after* the merger. Although the Kellys argue that the officers and directors of Sieg were surely positioning the company for just such an acquisition even before the merger, there was no testimony with regard to the effect of this potential opportunity on the value of Sieg–Fort Dodge stock in February of 1994.[7] As of that date, Sieg–Fort Dodge was on a downward financial spiral. The court was clearly justified in rejecting the price paid by A.P.S. *seven months later* for the *combined* assets of Sieg and its subsidiaries as probative of the value of Sieg–Fort Dodge alone in February. In other words, although the *merged* Sieg companies had considerable franchise value as reflected by this payment, that fact did not necessarily mean Sieg–Fort Dodge *alone* could have commanded a proportionate premium for its franchise value. *See* 12B Charles R.P. Keating & Jim Perkowitz–Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 5906.120, at 433 (perm. ed. rev.vol.1993) [hereinafter *Fletcher* ] ("The 'fair value' of shares is not to be measured *by any unique benefits that will accrue to the acquiring corporation,* but rather is to be determined on the basis of what a reasonable and objective observer would consider to be a price that reflects the intrinsic value of the right of stock ownership, *without regard to . . . any special bene-*

---

7. Givens testified that he considered the A.P.S. sale in his valuation of the dissenters' stock because the Kellys' stock ownership represented an ownership interest in Sieg–Fort Dodge's assets and liabilities. Since some of these assets and liabilities were later sold in the A.P.S. transac-

tion, Givens concluded the Kellys "would be entitled to a share" of the sale price. Givens did not analyze whether a separate sale of these assets and liabilities by Sieg–Fort Dodge would have garnered the same premium.

*fit to be derived by the acquiring corporation.*") (emphasis added).

In summary, the dissenters were not entitled to a proportionate share of the $10 million premium paid by A.P.S., as their expert testified at trial. They were only entitled to be compensated for the franchise value of Sieg–Fort Dodge and the present value of Sieg–Fort Dodge's future prospects. In the absence of testimony that the A.P.S. sale was probative of these factors, the trial court correctly rejected consideration of the A.P.S. sale.

### VII. *Attorney Fees.*

The Kellys contend they are entitled to attorney fees for two reasons: (1) the initial offer made by Sieg was arbitrary and not in good faith; and (2) Sieg did not act in good faith when it failed to increase its offer in light of subsequent developments. We will first discuss the applicable law and then we will address each argument advanced by the Kellys separately.

A. *Required showing.* Attorney fees may be awarded to dissenting shareholders under two circumstances: (1) "if the court finds the corporation did not substantially comply with the requirements of sections 490.1320 through 490.1328"; or (2) "if the court finds [the corporation] acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this chapter." Iowa Code § 490.1331(2)(a), (b). The Kellys rely only on the second alternative to support their claim for attorney fees.

■ We have previously discussed the trial court's decision-making process in determining whether to make an award of attorney fees:

> An award of attorney fees and expenses is a two-step process under section 490.1331. As a prerequisite for such an award, the trial court must make a factual finding that the corporation did not substantially comply with chapter 490 or acted arbitrarily, vexatiously or not in good faith. If the court finds either fact present, the court then has discretion to award attorney and expert fees and expenses in some amount.

*Security State Bank,* 554 N.W.2d at 893. Here, the trial court found no "circumstances" that would allow assessment of attorney fees and consequently, it denied the Kellys' attorney-fee claim. The Kellys contend the court's refusal to award them their litigation expenses was an abuse of discretion. Before we may consider the trial court's exercise of its discretion, however, we must decide whether there is any basis to disturb the trial court's finding that Sieg did not act arbitrarily, vexatiously or in bad faith. If this factual finding is supported by substantial evidence, it is binding on this court and we must affirm the trial court's denial of attorney fees to the dissenters. *See id.* ("[W]e are bound by the court's findings if supported by substantial evidence.").

The word "arbitrary" as used in section 490.1331(2) means "an unreasoned decision made without regard to law or facts." *Id.* at 894. "Vexatious" has a similar meaning: "lacking justification and intended to harass." *Webster's Third New International Dictionary* 2548 (unabridged ed.1993); *accord Black's Law Dictionary* 1565 (6th ed.1990) ( defining "vexatious" as "[w]ithout reasonable or probable cause or excuse").

The term "good faith" has various meanings; sometimes it is viewed objectively and at other times, subjectively. *Compare Aalbers v. Iowa Dep't of Job Serv.,* 431 N.W.2d 330, 335–36 (Iowa 1988) (holding "good-faith belief" measured by *objective* test in unemployment compensation context), *with Garvis v. Scholten,* 492 N.W.2d 402, 404 (Iowa 1992) (holding term "good faith" in Iowa Code section 232.72 "rests on a defendant's subjective honest belief"), *Meyers v. Canutt,* 242 Iowa 692, 698, 46 N.W.2d 72, 76 (1951) (holding "good faith" required for adverse possession means "the actual, existing state of mind" and "freedom from a design to defraud"), *In re Marriage of Voyek,* 491 N.W.2d 189, 190–91 (Iowa App.1992) (interpreting "good faith" as used in Iowa Code section 589.1(2) as referring to actual intent), *and* Iowa Code § 554.1201(19) (defining "good faith" under article 2 of Uniform Commercial Code as "honesty in fact in the conduct or transaction concerned"). We think "good faith" should be defined with a subjec-

tive focus for purposes of determining a party's right to attorney fees under section 490.1331 for two reasons. First, the objective reasonableness of a party's conduct is adequately addressed when considering whether the party acted arbitrarily. *See State v. Ahitow,* 544 N.W.2d 270, 273 (Iowa 1996) ("We do not interpret statutes in a way that makes portions of them irrelevant or redundant."). Second, a subjective focus is more consistent with the common, ordinary meaning of the phrase "good faith." *See State v. Kidd,* 562 N.W.2d 764, 765 (Iowa 1997) ("In the absence of a legislative definition of a term or a particular meaning in the law, we give words their ordinary meaning."); *Security State Bank,* 554 N.W.2d at 894 (giving word "arbitrary" in section 490.1331 its ordinary meaning). The following dictionary definition of "good faith" encompasses the essential elements of that term for purposes of chapter 490: "In common usage this term is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." *Black's Law Dictionary* 693; *accord Webster's Third New International Dictionary* 978 (defining "good faith" as "a state of mind indicating honesty and lawfulness of purpose ...: belief that one's conduct is not unconscionable or that known circumstances do not require further investigation: absence of fraud, deceit, collusion, or gross negligence").

 When we consider the ordinary meaning of the words used in section 490.1331(2)(b), we conclude the Kellys had to prove Sieg had no factual or legal basis for its fair-value determination or acted for a purpose other than to honestly pay the dissenters the fair value of their shares, including acting with an intent to defraud or to harass the dissenters. Because the trial court found the Kellys had not proved this factual prerequisite for an award of attorney fees, the question before us is whether there is substantial evidence in the record to support this finding.

 B. *Initial offer.* In view of the fact the trial court tripled Sieg's assessment of fair value, one might summarily conclude that Sieg's valuation of the dissenters' stock must have been arbitrary or not in good faith. We place little reliance, however, on the amount by which Sieg undervalued the dissenters' stock. If the difference between a party's valuation and the value ultimately set by the trial court were determinative, the dissenters would have difficulty showing their own good faith. Although Sieg undervalued the dissenters' shares by $40.07 per share, the dissenters overvalued their shares by $121.92 per share. Consequently, we think the objective and subjective process by which a party arrives at its fair-value figure is more important than the accuracy of that party's valuation, as later determined by the trial court. *See Security State Bank,* 554 N.W.2d at 895 (finding corporation acted arbitrarily where it offered no justification for or explanation of its calculation of fair value). We turn now to a review of Sieg's valuation methodology.

Two officers of Sieg testified at trial to the process by which Sieg arrived at its fair-value figure. It first calculated the book value of Sieg–Fort Dodge stock based on the most current financial data. Using this figure, the per-share value was $30.96. Sieg did not adjust this figure by restating the inventory to a FIFO basis. It had several reasons for not doing so: (1) Sieg's independent accountants had refused to certify Sieg's financial statements if inventory was stated on a FIFO basis; (2) Sieg–Fort Dodge's inventory was obsolescent and slow moving; and (3) Sieg's internal staff believed, based on their knowledge of Sieg–Fort Dodge's inventory, that the stated book value of the inventory was accurate. Starting with a figure of $30.96, Sieg applied a 27% marketability discount to arrive at a per-share value of $22.60.

The two witnesses testifying on behalf of Sieg stated that the directors thought this figure represented the fair value of the dissenters' stock. They believed their assessment of value was supported by their prior experience in valuing the stock of Sieg's other subsidiaries. The stock of the other subsidiaries had been valued similarly resulting in only one objection, that objection being the subject of *Sieg I.* (*Sieg I* was not decided on

appeal until after the merger of SiegFort Dodge into Sieg took place.) The directors also considered a 1993, arms-length sale of a small number of Sieg–Fort Dodge shares for $30.00 per share. *Cf. Chrome Data Sys., Inc. v. Stringer,* 109 Or.App. 513, 820 P.2d 831, 833 (1991) (holding consideration of prior sales of stock to "friendly buyers" was appropriate). Because the financial condition of Sieg–Fort Dodge had continued to deteriorate in the year following this sale, the directors concluded the stock was worth less at the time of the merger than it had been worth a year earlier. Finally, they relied on offers made by one Sid Fisher, who was pressuring Sieg to sell Sieg–Fort Dodge for "pennies on the dollar." *See id.* (holding preliminary offer "tended to prove the lowest possible value of the shares").

We conclude there is substantial evidence to support a finding Sieg had a factual and legal basis for its fair-value determination, and made a good faith effort to honestly assess the fair value of the dissenters' shares. Although it was ultimately unsuccessful in convincing the court to accept an inventory value based on a LIFO method, Sieg articulated credible reasons for its position that under the circumstances here LIFO was a more accurate valuation of Sieg–Fort Dodge's inventory than was FIFO. *See Application of Delaware Racing Ass'n,* 213 A.2d 203, 210 (Del.1965) (allowing 27% reduction in depreciated value of corporation's major asset due to its obsolescence). Moreover, even the trial court did not completely restate Sieg–Fort Dodge's inventory to a FIFO basis, but rather adopted the opinion of Sieg's expert, Maroney, that only a partial adjustment should be made.

The Kellys rely on *Sieg I,* where we affirmed the trial court's use of the FIFO basis in valuing inventory, as evidence of Sieg's bad faith. They argue an adjustment of inventory to a FIFO basis was "required" in *Sieg I,* and Sieg would have done so here had it acted in good faith. This argument misinterprets the scope of our decision in *Sieg I.* Whether inventory must be valued on a LIFO basis or FIFO basis is not a legal issue. The answer to that question depends on the facts of the particular case and the

experts' testimony. In *Sieg I,* we merely held that under the record presented there, substantial evidence existed to support the trial court's decision to value the subsidiaries' inventory on a FIFO basis. Our decision does not prevent a party from taking the position under different facts that restating inventory to a FIFO basis is not an accurate valuation method. Where that position is reasonably supported by the record, we cannot say the party acted in bad faith.

The action of Sieg in discounting the dissenters' stock for lack of marketability is more problematic. No one disputes there was a factual basis for such a discount; the question is whether such a discount is legally allowed. Although Iowa law was clear at the time Sieg made its valuation that a minority discount is not permitted, we have never decided whether a discount applicable to *all* shares of a closely-held corporation is permissible. *Security State Bank,* 554 N.W.2d at 889. Other courts considering this issue have disagreed. *See Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519, 525–26 (1994) (noting some jurisdictions allow marketability discounts and others do not, and listing cases); *Fletcher* § 5906.120, at 436–37 (discussing whether a marketability discount may be applied). Therefore, we cannot say Sieg had no legal basis for taking such a discount here. *Cf. Wetherbee v. Economy Fire & Cas. Co.,* 508 N.W.2d 657, 662 (Iowa 1993) (holding insurer was not acting in bad faith in denying underinsured motorist benefits where denial was based on an issue of law unsettled in Iowa and on which other jurisdictions disagreed).

We also note that Sieg's use of a marketability discount accounted for only a small portion of the difference between its valuation and the valuation adopted by the trial court. The trial court used a multiplier of 80%, compared to Sieg's multiplier of 73%. Assuming an adjusted book value of $78.34 per share (book value adjusted by partially restating inventory to a FIFO basis per Maroney's testimony), Sieg's per-share value would have been $57.19 compared to the court's value of $62.67, a difference of only $5.48 per share. Even if the marketability discount taken by Sieg is not allowed in

Iowa, an issue we do not decide, the impact this error had on Sieg's valuation of the stock was slight and would certainly support the trial court's exercise of discretion to deny the substantial attorney fees sought by the dissenters, particularly in view of the fact the use of a marketability discount was not done in bad faith. *See Waters v. Double L, Inc.*, 114 Idaho 256, 755 P.2d 1294, 1305 (Idaho Ct.App.1987) (holding because an award of attorney fees is discretionary, court may "consider attorney fees in relation to the underlying equities in the case"), *modified*, 115 Idaho 705, 769 P.2d 582 (1989); *Davis–Eisenhart*, 539 N.W.2d at 143 (finding no abuse of discretion in refusal to award attorney fees where "disparity [between corporation's offer and court's fair-value determination] was not so great as to constitute sanctionable conduct").

▮▮▮▮ C. *Failure to adjust fair-value determination.* The Kellys' final contention with respect to the attorney fees issue is that Sieg was obligated to negotiate with them in good faith to settle the case and avoid litigation. If a party relies on its adversary's failure to change its fair-value determination, we think it is incumbent upon the party to establish two things. First, if the adversary's initial offer was not arbitrary, vexatious or in bad faith, the party seeking attorney fees must show that later developments should have alerted the party that its initial offer now lacked a reasonable basis in fact or law. Additionally, the party must show a reasonable possibility that a change in its adversary's position would have avoided continued litigation. *See* Model Bus. Corp. Act § 13.31 official cmt., at 1441 (Supp.1990) (stating the purpose of awarding attorney fees is to encourage the informal settlement of valuation disputes without the need for a

judicial appraisal). We separately discuss each element.

The Kellys argue that even if Sieg's initial figure of $22.60 was not arbitrary or in bad faith, its later failure to increase its offer in light of our decision in *Sieg I* and the A.P.S. sale was arbitrary and in bad faith. We have already explained our belief that *Sieg I* and the sale to A.P.S. have only limited relevance to the valuation issues in this case. Nevertheless, we will assume Sieg should have recognized by virtue of its own expert's opinion, which valued the dissenters' stock at almost twice the price offered by Sieg, that it had undervalued the Kellys' stock. At that point, we believe Sieg had a duty under the statute to increase its offer.[8] Notwithstanding this assumption, we do not think the equities of this case warrant an award of attorney fees.

A party's potential liability for attorney fees is intended to motivate the parties to work out their disagreement on fair value and avoid litigation. *Id.* We do not believe, nor do the Kellys contend, that an offer from Sieg of $40.74 (Maroney's opinion of fair value) would have led to settlement of this case. By then, the Kellys had an expert advising them the value of their stock was $220.39 per share. Given this fact, the trial court could have reasonably concluded Sieg's failure to change its position did not warrant an attorney-fee award. Therefore, the trial court did not abuse its discretion in denying attorney fees. *See Davis–Eisenhart*, 539 N.W.2d at 143 (holding trial court did not abuse its discretion in refusing attorney-fee award against corporation where dissenter demanded more than his own appraiser said the stock was worth).

In summary, we cannot say as a matter of law that Sieg acted arbitrarily, vexatiously or

---

**8.** Chapter 490 does not expressly impose a duty to reevaluate one's fair-value determination. Nevertheless, we think such a duty is implicit in the statute. First of all, it is clear that a corporation's duty to offer fair value does not end once it has paid its estimate of fair value. Section 490.1330(1) requires the corporation to commence an appraisal action only when the dissenters' demand for payment (which occurs *after* the corporation's payment of its estimate of fair value) "remains *unsettled*." (Emphasis added.) If the corporation is under an obligation to respond

to the dissenters' demand for payment, surely it must do so in good faith and not arbitrarily or vexatiously. Moreover, we see no reason that this duty would terminate upon commencement of litigation if information comes to the attention of the corporation that makes continuation of its prior position arbitrary, vexatious or not in good faith. This interpretation of the statute is most consistent with the intention of the legislature to encourage informal settlements of fair-value disputes.

not in good faith. Nor, considering the equities of the case, do we believe the trial court abused its discretion. Therefore, we affirm the trial court's decision denying an award of attorney fees to the dissenters.

### VIII. *Summary.*

Substantial evidence supports the trial court's valuation of the Kellys' stock. The court correctly valued the stock on a date *immediately* before the corporate action. As a consequence, the court properly considered the depreciation in the stock's value in the years preceding the merger. The trial court could not exclude this depreciation because it did not occur in anticipation of the merger.

Additionally, the trial court did not err in failing to consider the A.P.S. sale. The price paid by A.P.S. was attributable to the franchise value of the *merged* Sieg companies. The fact the merged companies had this value does not establish that Sieg–Fort Dodge, appraised independently, had a proportionate franchise value.

There was also substantial evidence to support the trial court's finding that Sieg did not act arbitrarily or vexatiously, but rather acted in good faith with respect to the dissenters' rights under chapter 490. The initial offer made by Sieg had a reasonable factual and legal basis. There was evidence to support a finding the offer was the result of legitimate analysis and not made to harass or defraud the dissenters, or to force them to accept a paltry sum to avoid the expense of litigation. Finally, even if Sieg should have increased its offer in light of subsequent developments, there was no abuse of discretion in the court's refusal to award attorney fees because there is no hint in the record that the modest increase warranted by these developments would have led to fruitful negotiations between the parties. Therefore, the equities do not favor an award of attorney fees.

**AFFIRMED.**