# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KENDALL HOYD and SILVER SPUR CAPITAL PARTNERS, LP, | ) ) ) ) | |
| Petitioners, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0260-SG |
| TRUSSWAY HOLDINGS, LLC, | ) ) ) ) | |
| Respondent. | ) ) | |

## **MEMORANDUM OPINION**

Date Submitted: November 12, 2018
Date Decided: February 28, 2019

Thomas A. Uebler and Kerry M. Porter, of MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware, *Attorneys for Petitioner*.

Michael F. Bonkowski, Nicholas J. Brannick, G. David Dean, and Bradley P. Lehman, of COLE SCHOTZ P.C., Wilmington, Delaware, *Attorneys for Respondent*.

GLASSCOCK, Vice Chancellor

This is an appraisal action arising from the conversion of a corporation, Trussway Holdings, Inc. ("Trussway") into an LLC via merger. The Petitioner is a former stockholder of Trussway.[1] The parties agree as to the value of the corporate assets and liabilities, with the exception of the value of a wholly-owned subsidiary of Trussway. Valuation of that entity presents a rather straightforward matter of corporate valuation, with a limited set of issues, although those issues have been hotly contested by the parties.[2] I find that a contemporaneous-but-unconsummated sales process provides no meaningful evidence of value, and that the Petitioner's proposed "comparable" companies are not sufficiently comparable to support a valuation; therefore, I rely on a discounted cash flow analysis to determine value, aided by the reports and testimony of the proffered experts. Adding the value of the company's subsidiary to its agreed-to assets and subtracting its agreed-to liabilities, divided by the number of shares outstanding, I find the value of Trussway to be $236.52 per share at the time of the merger. My reasoning follows a brief statement of the facts, below.

---

[1] Two Petitioners brought this action, but Petitioner Kendall Hoyd reached a settlement with Trussway before trial.

[2] In briefing, the Respondent at one point refers to the Petitioner's argument as "salacious." Resp't's Post-Trial Answering Br., at 1. By this, I assume from context, the Respondent means to say the Petitioner's argument is exaggerated, histrionic or defamatory. I have seen a number of examples of such usage in recent years; nonetheless, this does not comport with my understanding of the term "salacious." *See Salacious*, Merriam-Webster's Third New International Dictionary (3d ed. 2002). Such things are, of course, entirely a matter of taste; as for me, I found nothing salacious in the briefing, at all.

# I. BACKGROUND

## A. *The Parties*

Petitioner Silver Spur Capital Partners, L.P. ("Silver Spur") and former Petitioner Kendall Hoyd were the only minority stockholders of Trussway Holdings, Inc. Both sought appraisal of their shares. During the course of the litigation, Hoyd and the Respondent reached a settlement, leaving Silver Spur as the sole Petitioner seeking appraisal.[3] On the date of the merger, Highland Select Equity Fund, L.P. owned 577,796 of the 605,956 outstanding shares of Trussway, aggregating to 95.35% of the company's stock.[4] Of the roughly 5% of stock remaining, Hoyd owned 13,432 shares and Silver Spur owned 3,465 shares.[5]

Respondent Trussway Holdings, LLC is a Delaware limited liability company with a principal place of business in Houston, Texas.[6] Prior to the merger that prompted the Petitioners here to seek appraisal, the Respondent's predecessor, Trussway Holdings, Inc., had one wholly-owned subsidiary, Trussway Industries, Inc. ("TII").[7] It also owned investments in two companies, Targa and Tandem, which were not publicly traded, and held publicly-traded stock in Building Materials

---

[3] Pre-Trial Stip. and Order, at 2.
[4] *Id.* at 3; JX 71, at 77.
[5] JX 71, at 77.
[6] Rep't's Pre-Trial Br., at 7–8.
[7] JX 103.

Holding Corporation.[8]   The subsidiary, TII, itself had two wholly-owned subsidiaries, Trussway Manufacturing, Inc., and Trussway Construction, Inc.[9] Under this arrangement, TII was the leading manufacturer of pre-fabricated trusses and related components in the multi-family housing market.[10]  TII operated six manufacturing facilities in the United States and had approximately 930 employees.[11]

B.    *The Merger*

On July 27, 2017, TII engaged Moelis & Company as its investment banker for purposes of a sale of TII.[12]  Moelis concluded that TII's enterprise value could range from $202 million to $298 million.[13]  Moelis contacted 76 parties, of whom 27 executed non-disclosure agreements and received TII's confidential information presentation.[14]  Ultimately, seven parties expressed interest by October 21, 2016.[15]

In November 2016, TII management conducted presentations with the seven interested parties.[16]   Included in the presentation materials were pre-merger

---

[8] JX 92, Moore July 10, 2018 Dep., at 6:8–7:8, 16:13–18:7; JX 102, Moore Aug. 16, 2018 Dep., at 167:15–17; JX 94, at n.174.
[9] JX 103.
[10] Resp't's Pre-Trial Br., at 8; JX 43, at 4.
[11] JX 43, at 5.
[12] JX 27.
[13] JX 23, at 22.
[14] JX 34.
[15] *Id.*
[16] *See generally* JX 43; JX 44.

3

projections created by TII management (the "Project Point Projections").[17] These were nine-year projections, from 2017 to 2025.[18] In contrast with less-optimistic, internal management projections made in 2015 and 2016,[19] the Project Point Projections forecasted that TII revenue would be $218.2 million in 2016, that it would grow to $235.9 million in 2017, and that thereafter it would grow anywhere from 2.2% to 14.9% annually, through 2025.[20] Nevertheless, these "numbers were brought down a couple of times, at least once, during the [sales] process because the business wasn't performing as was anticipated."[21]

The Project Point Projections also included four categories of strategic initiatives; projected costs, revenue, and EBITDA from those initiatives were added to a base case. These initiatives were building a plant in Nevada or Arizona to sell their products to the Las Vegas and Southern California markets;[22] expanding the sale of other products (besides trusses, such as wall panels);[23] expanding the sale of products to the single-family market;[24] and gaining additional market share through

---

[17] JX 43, at 41.
[18] *Id.*
[19] 2015 projections forecasted that TII's revenue would increase from $196 million in 2015 to $204 million in 2016, but would then decline each year to reach $132.76 in 2019. JX 9, at 5. According to one board member, this decrease in revenue was due to projected declines in multi-family housing starts. JX 102, Moore Aug. 16, 2018 Dep., at 181:14–20. A set of five-year projections developed in 2016 also forecasted that TII's revenue would decline through 2020. JX 17, at 4.
[20] JX 43, at 41.
[21] JX 101, Sellman Dep., at 41:4–7. Sellman stated that this "happens often." *Id.* at 41:7.
[22] JX 43, at 47.
[23] *Id.* at 46.
[24] *Id.* at 37.

sales to new segments, such as senior living, stores and restaurants, hotels and motels, offices, banks, and dormitories.[25] These four initiatives are referred to collectively as "the strategic initiatives." The strategic initiatives had the effect of increasing TII's projected revenue and EBITDA; by 2025, they accounted for 39% of revenue and 43% of EBITDA in the Project Point Projections.[26]

On December 9, 2016, Trussway's Board of Directors approved an Agreement and Plan of Merger between Trussway and TW Merger Sub, Inc.[27] As a result of this plan, Trussway merged into TW Merger Sub, with Trussway LLC being the surviving entity.[28] In essence, Trussway and its subsidiaries would be transformed from corporations into limited liability companies.[29] On the merger date, each share of Trussway common stock was canceled and converted to common units of Trussway Holdings, LLC (the Respondent here). The Petitioners did not vote in favor of, nor did they consent to, the merger.[30] They subsequently delivered appraisal demands to the Respondent.[31]

As of the merger date, the sales process for TII was ongoing. On February 27, 2017, Builders FirstSource submitted an offer to purchase TII for "$170 million

[25] *Id.* at 38.
[26] Trial Tr., at 144:15–145:3 (Scheig).
[27] JX 50; JX 51.
[28] Conversion to an LLC would avoid tax liability in the event of a sale. JX 102, Moore Aug. 16, 2018 Dep., at 10:4–14.
[29] JX 54; JX 102, Moore Aug. 16, 2018 Dep., at 10:1–14, 13:11–14:7.
[30] Pet'rs' Pre-Trial Br., at 15.
[31] JX 58; JX 59.

5

(on a cash-free, debt-free basis and assuming a normalized level of net working capital at closing)."[32] That offer was withdrawn four days later on March 3, 2017.[33] Moelis's engagement ended in March 2017.[34] No sale of TII has been consummated.

## C. *This Litigation*

### 1. Procedural History

The Petitioners filed this appraisal action on April 6, 2017.[35] The parties engaged in motion practice over the next fourteen months, with the Petitioners filing motions to compel, which were resolved among the parties. On July 13, 2018, Hoyd and the Respondent arrived at an agreement in principle to settle Hoyd's claim.[36] This left Silver Spur as the only remaining stockholder seeking appraisal. Trial was held on September 6 and 7, 2018. Afterward, the parties submitted post-trial briefing, which concluded on November 12, 2018.

### 2. The Parties' Contentions

Silver Spur claims that each share of Trussway was worth $387.82 per share on the merger date.[37] By contrast, the Respondent contends that the fair value was $225.92 per share.[38]

---

[32] JX 74.
[33] JX 81.
[34] JX 84.
[35] *See* Compl.
[36] Pre-Trial Stip. and Order, at 2.
[37] Pet'rs' Pre-Trial Br., at 51.
[38] Resp't's Pre-Trial Br., at 68.

Supported by their expert witness, Gregory E. Scheig ("Scheig"), Silver Spur contends that the fair value of Trussway as of the Merger Date was $387.82 per share.[39] To arrive at this figure, Scheig valued TII through a combination of a DCF analysis and two market approaches.[40] He applied 60% weight to his DCF analysis, 30% weight to a comparable companies analysis, and 10% weight to a precedent transaction analysis.[41] Scheig adopted a set of sixteen guideline companies that he deemed comparable for valuation purposes.[42]

The Respondent submits that Trussway's fair value on the Merger Date was $225.92 per share.[43] Its expert, Professor Jack F. Williams, valued TII via two DCF analyses.[44] Like Scheig, Williams also conducted a Market Approach analysis; however, unlike Scheig, Williams did not apply that analysis to his final valuation.[45] Instead, Williams used a variation of the Income Approach, applying 25% weight to a DCF analysis based on the Project Point Projections, and 75% weight to an alternate DCF analysis, which was based on a manipulated management projection over a five-year period, until 2021.[46]

---

[39] JX 98
[40] JX 96, at 20.
[41] *Id.*
[42] *Id.* at 17–18.
[43] Resp't's Pre-Trial Br., at 68.
[44] JX 94, at 47–48.
[45] *Id.* at 49–50.
[46] *Id.* at 47–48.

7

The experts' reports differ on several points: (i) how the Project Point Projections should be used and the weight they should be given; (ii) the appropriate beta calculation; (iii) residual value for a DCF analysis; (iv) whether to use a Comparable Companies analysis; (v) whether to use a Precedent Transaction analysis.

i. The Project Point Projections

The experts do not dispute that the Project Point Projections are relevant to valuation of Trussway;[47] however, the parties disagree about how the Projections should be used. Silver Spur's expert, Scheig, used the Project Point Projections in his DCF in their entirety, as there was "no reason to doubt that the forecasts provided to it were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the company."[48] The Respondent, on the other hand, argues that out of the Project Point Projections, only the base-case projections should be considered, and not the four strategic initiatives.[49] Alternatively, the Respondent submits that if the strategic initiatives are included, that greater weight be assigned to the first five years of company projections, as Williams did in his report.[50]

---

[47] The parties and their experts refer to "Trussway" as the subject of their financial analyses; I continue that practice in this Memorandum Opinion. Strictly speaking, the DCF is for the value of Trussway's subsidiary, TII.

[48] Pet'rs' Pre-Trial Br., at 21 (quoting JX 101, Sellman Dep., at 43:6–11).

[49] Rep't's Pre-Trial Br., at 33.

[50] *Id.* at 38–39.

ii.  Beta

For the most part, the parties' experts agree in their WACC calculations.  The exception is in calculation of beta.  In his DCF analysis, Scheig used adjusted beta, which gives 2/3 weight to raw beta and 1/3 weight to a mean beta of 1.0.[51]  Williams used raw beta, which "measures data purely from a historical returns perspective."[52]

Moreover, there are various methods by which beta can be "unlevered" and "relevered."  While similar in nature, these methods use different inputs.  In his DCF analysis, Scheig used the Hamada method to unlever and relever beta, whereas Williams used the Harris-Pringle method.  Both approaches are similar in their assumptions of the value of the company's assets to its debt and equity; however, the methodologies differ in their respective treatment of debt.[53]  In the end, these differing treatments can lead to notably disparate beta calculations.

As a result of these differences, Scheig derived a WACC of 13.4%,[54] while Williams derived a WACC of 15.4%.[55]

iii.  Residual Value

Two methods for computing terminal value are the Exit Multiples Model and the Growth in Perpetuity Model.  Scheig used both models.  He employed the Exit

---

[51] JX 98, Sched. B.6.
[52] JX 94, Ex. 3.3. I note also that Scheig used weekly returns when calculating beta, whereas Williams used monthly returns.  *See* Trial Tr., at 56:18–19.
[53] JX 97, at 21.
[54] JX 98, Sched. B.6.
[55] JX 94, Ex. 3.3.

Multiples Approach, averaging the residual value of Trussway derived from a Gordon Growth Model, and the residual value of Trussway derived from using an EBITDA exit multiple of 7x.[56] With this method, Scheig derived an average residual value of $453 million, discounted to a present value of $155.6 million on the Merger Date.[57]

The Respondent contends that using an Exit Multiple Approach improperly augmented Scheig's residual value.[58] Per the Respondent, only the Gordon Growth Model should be used to determine residual value.[59] Williams used this model, with a 2.3% growth rate.[60] In turn, Silver Spur argues that this figure is too low, considering Trussway's projected growth and the fact that a 2.3% growth rate "is equal to expected inflation and thus reflects an assumption that Trussway [] would not grow in excess of inflation . . . ."[61]

### iv. Comparable Companies Analysis

The parties disagree on whether a Comparable Companies Analysis should be used. This Analysis accounted for 30% of Scheig's valuation. After selecting sixteen comparable companies, Scheig calculated their historical profitability and

---

[56] JX 98, Sched. B.7.
[57] *Id.*
[58] Resp't's Pre-Trial Br., at 55.
[59] *Id.* at 56.
[60] JX 94, at 39.
[61] Pet'rs' Pre-Trial Br., at 40.

the enterprise value to EBITDA multiples.[62] He used a 9.8x multiple, which Silver Spur contends is conservative.[63] He derived an implied enterprise value of $242.3 million.[64] He then added $7.6 million cash and subtracted $62.6 million debt, to arrive at an equity value of $187.3 million on a minority, marketable interest basis. Next, Scheig applied a 25% control premium.[65]

Conversely, the Respondent contends that there are no truly comparable companies, and thus, such analysis is unwarranted. Per the Respondent, "TII is a unique asset given its nearly exclusive focus on the multi-family market."[66] Furthermore, the Respondent argues that a 25% control premium is improper and is not grounded in authority.[67]

### v. Precedent Transaction Analysis

The parties also disagree on whether to use a Precedent Transaction Analysis. This Analysis accounted for 10% of Scheig's valuation. He observed data from five transactions in the S&P Capital IQ database, from 2015 forward, where the target was in the building materials or truss industry.[68] Scheig determined that one transaction could provide a reliable indication of Trussway's value; that transaction

---

[62] JX 96, Sched. C.1.
[63] *Id.*; Pet'rs' Pre-Trial Br., at 24.
[64] JX 96, Sched. C.1.
[65] JX 96, Sched. C.3.
[66] Resp't's Pre-Trial Br., at 45; *see also* JX 101, Sellman Dep., at 117:15–118:2.
[67] Resp't's Pre-Trial Br., at 52.
[68] JX 96, at 19; *id.* at Sched. D.

had an EBITDA multiple of 9.9x.[69]  Ultimately, after applying that 9.9x multiple to

Trussway's EBITDA, adding cash, and subtracting debt, Scheig derived an implied

equity value of $212.3 million.[70]  However, per Silver Spur, because there was just

one reliable transaction, Scheig chose to assign this precedent transaction analysis

only 10% weight.[71]

The Respondent posits that using only one company is insufficient for a

reliable precedent transaction analysis.[72]  For that reason, it argues the analysis

should have no weight in this valuation.[73]

## II. ANALYSIS

A.  *Legal Standard*

Statutory appraisal is a right provided to shareholders who dissent from a

merger on the grounds that the offering price is inadequate.[74]  After a shareholder

seeks appraisal, the Court determines the fair value of the shares as of the merger

date.[75]  Because Silver Spur has perfected its appraisal right as required by Section

---

[69] JX 96, at 19.
[70] *Id.*
[71] Pet'rs' Pre-Trial Br., at 28.
[72] Resp't's Pre-Trial Br., at 63–65.
[73] *Id.*
[74] *See Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988).
[75] *See id.*

262,[76] it is entitled to have the Court determine the intrinsic value of its shares as on the Merger Date.[77]

"In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of the evidence."[78] The Court determines "the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value."[79] In making that determination, the Court "should first envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such."[80] Section 262 requires the Court to perform an independent examination of fair value at the time of a transaction, and it vests with the Court the discretion to consider "all relevant factors" and determine the going concern value of the subject company.[81] Furthermore, this Court may consider "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court . . . ."[82]

---

[76] Pre-Trial Stip. and Order, at 2.
[77] DGCL § 262(d).
[78] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).
[79] DGCL § 262(h).
[80] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d. 1, 20 (Del. 2017) (citing *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989)).
[81] DGCL § 262(h).
[82] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

*B.*     *The Comparable Companies Analysis and Valuation Derived from the TII*

   *Sales Process*

As discussed above, in his valuation of Trussway, Silver Spur's expert, Scheig, in addition to a DCF, used a Comparable Companies Analysis and a Precedent Transaction Analysis in his valuation, assigning each valuation 30% and 10% weight, respectively. TII is a private company whose business has focused substantially on building trusses for the multi-family housing market. I agree with the Respondent that Scheig's supposed "comparable companies" are too divergent from TII, in terms of size, public status, and products, to form meaningful analogs for valuation purposes. Therefore, under these facts, I reject a valuation using these methodologies, and rely on a DCF analysis.

Neither party contends that the abortive sales process resulted in a value that represents statutory fair value. They disagree as to whether the indications of interest and preliminary offer have any evidentiary value. At the time of the sale process, TII received one offer, for $170 million, which was subsequently withdrawn. Because these indicia were preliminary, I find them useful only as a very rough reasonableness check.

*C.*     *The DCF Valuation*

The parties' experts use similar methods for conducting their DCFs, with a few notable disagreements. I accept their methodology, and resolve their disagreements, as follows.

### 1. The Nine-Year Projections

TII routinely created projections for the business. The closest in time are the nine-year projections made by TII Management, the Project Point Projections. These were used in the course of business, and were also intended for use in the sales process. While a shorter projections period is more common, the nine-year period here is employed in part because TII's business was in the multi-family housing industry, which is cyclical.[83] In the nine-year projections, the long period helped to eliminate cyclic distortion. The Project Point Projections contained projections based on strategic initiatives, which the evidence shows were planned and budgeted, but which had not commenced as of the merger.

The Project Point Projections were intended partly for sales purposes and were thus optimistic, and they contained strategic initiates not yet realized. For those reasons, the Respondent's expert, Professor Jack Williams, discounts the reliability of the Project Point Projections. Williams proposes several ways to account for this, but suggests a 25% reliance on a DCF based on the Project Point Projections, and 75% reliance on a set of projections derived from the Project Point Projections, but

---

[83] *See, e.g.*, Trial Tr., at 183:5–7 (Scheig); *id.* at 212:20–23 (Williams).

15

not including the final four years (that is, a DCF entering the terminal period after five years). In contrast, the Petitioner's expert, Mr. Gregory Scheig, uses the full nine-year Project Point Projections, but adds a 1% "risk premium" to WACC to allow for the reduced predictability of performance in the outer four years.

I find the Project Point Projections (including the strategic initiatives), as management's contemporaneous best estimate, to be the best predictor of TII's performance. The Respondent points out that this Court has rejected, for instance, potential acquisitions not yet close to consummation as outside the operative reality of an entity for appraisal purposes; they argue that the initiatives should receive the same treatment here.[84] I disagree. I must value Trussway as a going concern; here, TII had the unilateral choice to pursue the initiatives, and projected that they would do so. Under our statute, this is part of Trussway's operative reality. Of more concern to me is Trussway management's ability (or that of any human prognosticator) to accurately predict corporate performance nine years out, particularly concerning new facets of a business. I am also aware that there is a degree of huckster's optimism in these predictions. Scheig relies on the addition of a 1% "risk premium" to WACC to account for this uncertainty. The record, however, does not demonstrate why this particular adjustment is appropriate. I

---

[84] *See* Resp't's Pre-Trial Br., at 34 (citing *In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *17 (Del. Ch. Feb. 23, 2018)).

decline, therefore, to apply Scheig's method to account for uncertainty inherent in the Project Point Projections.

Instead, I adopt a modified version of Williams' approach. I have blended two DCF values, one derived from the nine-year Project Point Projections, and a second derived from the same management forecasts, with a terminal period beginning after a more standard five years. I have assigned 50% weight to each. Each DCF applies Williams' calculation, from the Project Point Projections, of managements' projected annual cash flows and expected debt and equity levels, which I find appropriate.

2. WACC and Beta

I adopt Williams' approach to calculate beta. The parties' main disagreement is whether to use historic or adjusted beta. I am unconvinced that adjusted beta would be appropriate for this small, private corporation. In any event, since I give 50% weight to management's nine-year prediction of cash flows growing at a high rate, any error in applying historic beta is minimized. Since I am largely following Williams' approach to the DCF, I retain his use of the Harris-Pringle model, employing monthly returns, for unlevering and relevering beta—the difference between this and the Hamada approach suggested by Scheig is *de minimus* here. This results in a beta of 1.74.

The parties are in basic agreement on calculation of WACC, except that Scheig advocated an unsystematic risk premium of 1%, based on the risk inherent in the use of the nine-year Project Point Projections. Since, as addressed above, I have accounted for that separately, it would be error to add the unsystematic risk premium to WAAC. Accordingly, and using the parties' other, agreed-to inputs, I calculate a WACC of 15.4%.

3. Residual Value

Both experts employed the Gordon Growth Model. Scheig employed that model combined with an Exit Multiples Approach, with each weighted 50%. Williams applied a 2.3% perpetual growth rate, solely under the Gordon Growth Model. Given the fact that I have used management's nine-year projections in my DCF, including its optimistic growth forecasts, use of the Exit Multiples Approach (for which Scheig advocates), with its high long-term growth rate assumptions, is unwarranted. I use the Gordon Growth Model with a 2.3% growth rate.[85]

## III. CONCLUSION

A DCF, with the assumptions described above and otherwise as agreed to by the parties, based solely on the nine-year Project Point Projections, values TII at $197,814,675. A DCF based on the first five years of those Projections results in a value of $168,820,553. The average of the two (based on a weight of 50% each)

---

[85] Both parties' experts used this growth rate.

18

results in a value of $183,317,614 for TII. Adding this asset value to Trussway's other stipulated assets and liabilities results in a value of $143,318,615 for Trussway. This value, divided by the shares outstanding, results in a value for Trussway of $236.52 per share. An appropriate order accompanies this Memorandum Opinion.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

KENDALL HOYD and SILVER SPUR ）
CAPITAL PARTNERS, LP, ）
 ）
 ）
Petitioners, ）
 ）
 ）
v. ） C.A. No. 2017-0260-SG
 ）
 ）
TRUSSWAY HOLDINGS, LLC, ）
 ）
 ）
Respondent. ）

## ORDER

AND NOW, this 28th day of February, 2019,

The Court having considered the Petition for Appraisal, and for the reasons set forth in the Memorandum Opinion dated February 28, 2019, I hereby determine that the fair value of Trussway Holdings, Inc. as on the merger date is $236.52 per share.

SO ORDERED:

*/s/ Sam Glasscock III*

Sam Glasscock III